# Helton v. Commonwealth.

(Decided February 9, 1932.)

HIRAM H. OWENS for appellant.

J. S. CAMMACK, Attorney General, and S. B. KIRBY, JR., Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

There is no conflict concerning the fact that Omer Mackey was shot and killed while running upon the approach of officers of the law, or that three of the officers fired their pistols at almost the same moment. Each of them insists that he fired into the ground. The question at issue in the case was and is who fired the shot which struck Mackey, or specifically whether the evidence introduced on the trial of the appellant, Nat B. Helton, is sufficient to sustain the verdict of the jury finding him guilty and sentencing him to serve seven years in prison.

The appellant is a man 66 years old and had been for many years an officer of Knox county. On the morning of November 5, 1930, on request of Guy Tuggle, Federal Prohibition Agent, J. R. Selvey, deputy sheriff of Laurel county, and Alex Knuckles and Thiary Helton, deputy sheriffs of Knox county, the appellant accompanied them on a moonshine still raid in the country. The officers stopped their automobile below the home of John Rose, which was on a hillside about 150 feet north of the road. Knuckles, Selvey, and Thiary Helton together went to a point a short distance off the road and west of the house. Tuggle and the appellant went towards the front of the house. At the immediate time concerned, the appellant was farther east and apparently beyond the east wall of the house and below Tuggle. Mackey ran out of a door on the west side and started

running up the hill back of the house in a northeasterly direction, which put his back to Knuckles and Selvey and almost his right side toward Helton.

The relation of the parties to each other is important in a consideration of the case. Perhaps it will be made clearer by describing the position of the parties as being in the form of a triangle, with the base below the house, consisting of a line drawn from Knuckles et al. to the appellant, a perpendicular extending on an obtuse angle from him to Mackey on the hill back of the house, and the hypotenuse formed by a line between him and Knuckles et al. The house, a small one, was on a steep hillside. About 100 feet back of it was a ledge of rock, from one to two feet high, running east and west. Its elevation was nearly 100 feet above and 280 feet distant from the point where Knuckles, Selvey, and Thiary Helton were, and about 50 feet above and 100 feet distant from the appellant. There was a semblance of a path which the fleeing man was following.

We note first the evidence of Tuggle, the Federal Prohibition Agent. After Mackey ran from the west door of the house and up the hill back of it, Tuggle called to him to wait. About the time he reached the ledge of rock and while he was on or nearly on his hands and knees in a crawling position, as though climbing over the ledge, Knuckles and Selvey, who were back of the witness, each fired his pistol. He remonstrated with them, although he did not see in what direction they fired. He testified that at that moment Mackey put his hand to his back and had it there when, a second later, the appellant fired. But Tuggle was not looking at the appellant. When he shot, Mackey immediately holloed, "Oh, Lordy!" or something of the kind. He crawled on several yards into the bushes, where he was found, brought to the house, and shortly thereafter died.

Selvey testified that he called to Tuggle that somebody was running off when Mackey ran out of the house, and that Tuggle holloed to him. Then he (Selvey) fired his pistol in the ground, which was a signal that had been used before to attract the attention of the other officers not within hailing distance. Knuckles, by his side, also fired into the ground about the same time. In a moment the appellant fired and Mackey holloed, "Oh, Lordy!" He testified that after Mackey ran around the

house he passed from his view and never came in sight again.

Knuckles corroborated Selvey, except to say that each of them fired in the direction of the fleeing man, but into the garden, while he was 50 or 60 yards above it; that is, higher up on the hillside. However, he contradicts Selvey by saying that Mackey came within the range of their vision for a minute or two and then passed out of sight. On going to the wounded man an empty whisky bottle was found at the ledge of the rock where he had been running and 6 or 8 feet below the point where he had fallen.

Enos Rose, a fifteen-year-old brother-in-law of the deceased, ran out of the house when he heard the shooting. He saw the appellant and Tuggle below the house and Mackey running or crawling up the hill with his hand on his right hip. He had turned to his right and was going along the side of the hill above the ledge, and then had "kindly his face and his right side" towards Helton. This was before he heard Helton shoot. Mackey then called out "Oh, Lordy!" He says that Helton had his pistol pointed towards the fleeing man.

Richard Martin testified that that afternoon he had a talk with the appellant and Thiary Helton about how the tragedy occurred, and appellant stated that he saw somebody above the house run and fall "kinder" down on his knees and put his hand to his pocket; thinking he was drawing a weapon, he (the appellant) pulled his own pistol, for he knew if Omer Mackey commenced shooting he would be in sight of him, but instead of shooting his pistol Mackey had pulled a bottle and thrown it down. Then, he had stated, after Mackey got to his feet he fired, but said, "I don't think I shot in twenty feet of him or near about the man." He didn't know Mackey, but swore he believed at the time it was "Peg-leg Ed" trying to get away on his wooden leg. Martin's son substantially corroborated him.

There was some proof that the appellant was not on friendly terms with his cousin, Ed Helton, who had a wooden leg and was called "Peg-leg Ed." The inference drawn from his testimony is a motive on the part of the appellant to shoot at Mackey believing him to be "Peg-leg Ed."

The defendant insisted on the trial, and now insists, that Knuckles or Selvey fired the fatal shot, and that

they are laying the crime at his door in order to save themselves. He testified that they were holloing for the fleeing man to halt; that they fired twice when Mackey fell on his hands and knees, and holloed, "Oh, Lordy!" That he then partially straightened up and with his hand to his back turned more to the right. This placed his right side towards him. Then he shot into the hillside much below and in front of him, that is, if he had elevated his pistol the ball would have gone in front of Mackey; and says that it would have been impossible for his bullet to have struck Mackey. He was running directly from the other officers and his back was squarely towards them when they fired. The accused was sure of the place where he was standing by the location of a tree. While in jail the next day he drew a map from memory of the situation, though he had never been at the place before that day. He did not know Mackey and fired only because he thought it might stop him and without any intention to kill him. He testified that in going to the body of Mackey, Knuckles picked up the bottle of whisky, and when he asked him, "Whose is it, Alex?" he responded: "I don't know; it ain't any difference; come on; when I shoot I get the goods." In this he was corroborated by Thiary Helton, but contradicted by Knuckles. The defendant denied that he made the statements as to "Peg-leg Ed Helton," or that he had anything against him.

Thiary Helton, a deputy sheriff and very distant relative, was introduced by the defendant. He was right by the side of Knuckles and Selvey and testified that they both shot "right in the direction" of Mackey, who was at all times within their vision and range and was at the moment in a "double position." He saw one of the bullets strike the dirt behind him and then after taking a step or two he fell. As he did so he pulled something from his pocket, which proved to be the bottle. Then in a stooping position he went on, crying out as if in pain. After he had turned to the right, witness heard the third shot, the sound of which came from where Helton and Tuggle were. Several testified that this witness had stated in substance shortly after the shooting and while on the premises that there was no doubt that the appellant, Nat Helton, had shot and killed Mackey.

Surveyors went the next day and made measurements and took notes of the situation, and, upon informa-

tion furnished by members of John Rose's family and appellant's sketch, fixed the location of each party to the tragedy and disclosed on their maps the distances from where they were to the point at which the deceased was shot. Judging by the testimony of those present, it would appear that the locations were substantially correct. From them it appears on the maps that the fleeing man was at all times within the line of vision of Knuckles, Selvey, and Thiary Helton, and that he was running directly away from them and "angling" from the appellant; that is, that the deceased's back was toward the former men and his right side nearly toward the appellant. Some of the testimony of Selvey and Knuckles, as do the maps, indicate a contradiction in their explicit statements that the deceased was not within their line of vision except for a few feet at the corner of the house, or, as Knuckles says, for a brief interval thereafter. Undoubtedly the man was shot as he was bending over to climb or crawl upon the ledge of rocks or just as he got on top of it, at a considerable height above all of the officers.

The bullet entered the body about one inch to the right of the tip of the coccyx and at the left or inside of the right buttock and never came out. This physical fact is of prime importance, as it makes it highly improbable that that bullet came from appellant's pistol.

In further support of the defendant's contention of innocence is the evidence of the surveyors, who were apparently disinterested, that when on the ground the first day they observed at a point near where the appellant was said to have been standing a large milk weed notched and broken as if by a bullet. Using that as a basis for sighting, a short distance beyond they found a little hole in the ground. The soil was hard and rocky, and they dug into that hole only a few inches because they only had a stick and penknife. The next day they returned and with some tools dug deeper and extracted from the ground a .45 bullet which was produced on the trial. The defendant, on the day of the tragedy, had a .45 pistol; Selvey had a .38; and Knuckles, a United States New Service Automatic, the caliber of which is not disclosed.

This evidence is most potent. The defendant produced the bullet which he fired into the ground. Of its identity there can be little doubt. It is certain that one

of these three men is guilty of this crime. The calibers of their pistols differ from each other. It was within the power of the commonwealth to produce the bullet which killed the man, for it appears not to have gone through him. Sexon v. Commonwealth, 239 Ky. 177, 39 S. W. (2d) 229; Evans v. Commonwealth, 230 Ky. 411, 19 S. W. (2d) 1091, 66 A. L. R. 360; Gray v. State, 55 Tex. Cr. R. 90, 114 S. W. 635, 22 L. R. A. (N. S.) 513. It did not do so. No witness testifies that it was the defendant's shot which killed Mackey, although there is some evidence of circumstances which indicate that it might have been. But Selvey and Knuckles were very much concerned in the outcome of the defendant's trial. The former is contradicted by the latter, by Thiary Helton, and by the maps in his testimony that the fleeing man was not in his sight after leaving the house. Disregarding the defendant's testimony, the evidence of Tuggle and the Rose boy, apparently disinterested, is very indicative of the defendant's innocence. Their evidence and the undenied and undeniable physical facts are of such force as all but overcome the inferences of the appellant's guilt to be deduced from the verbal evidence of the circumstances.

It is a well-established rule that if proof of guilt of a crime is dependent upon circumstantial evidence which may be as reasonably consistent with innocence as with guilt, it will be held insufficient to support a conviction. Marcum v. Commonwealth, 212 Ky. 212, 278 S. W. 611; Fuson v. Commonwealth, 230 Ky. 761, 20 S. W. (2d) 742; Denham v. Commonwealth, 239 Ky. 771, 40 S. W. (2d) 384; Tarkaney v. Com., 240 Ky. 790, 43 S. W. (2d) 34, and cases cited therein. On this evidence we could not in good conscience permit the conviction of this man to stand, and must therefore reverse the judgment because the verdict is flagrantly against the evidence.

Since there may be another trial, we shall notice the complaint that the court erred to the defendant's prejudice in admitting evidence that shortly after the tragedy Thiary Helton stated that Mackey was certainly killed by Nat Helton (the appellant), as there was no one else who could have done it. Before this was introduced, the witness had denied making the statement, and the court properly admonished the jury that the evidence went to his credibility. The evidence was competent for that purpose. Although negative in form, it was essentially and in effect an affirmative declaration that Helton had

killed Mackey, for he was standing by the side of the other two men and knew what they had done. His statement, if made, thereby eliminated or absolved them, while on the trial he testified to contradictory facts. The statements clearly come within the rule discussed fully in Crawford v. Commonwealth, 235 Ky. 368, 31 S. W. (2d) 618, 619, wherein it was held reversible error to have excluded evidence that an eyewitness testifying against the accused had said immediately after the killing that the defendant had to kill the deceased to keep from getting killed himself, and other statements of similar effect. See also Stewart v. Commonwealth, 235 Ky. 670, 32 S. W. (2d) 29, for further consideration of classification of statements within the Opinion Rule.

The instructions, which were prepared by the late Hon. I. N. Steely, as special judge, are well-formed and fully and correctly cover such a state of case as was presented by the evidence.

The judgment is reversed, and the case remanded for a new trial on the ground stated.

Whole court sitting.