# Davis v. Commonwealth.

(Decided Oct. 5, 1937.)

HIRAM H .OWENS and L. O. SILER for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE BAIRD—Affirming.

Luther T. (Pat) Davis was convicted by a jury and adjudged guilty of voluntary manslaughter in the Whitley circuit court. His punishment was fixed at two years in the state reformatory. He appeals.

His counsel relies solely and alone on one alleged error. In fact, he specifically waives all other errors that might be in the record. He insists that the evidence

offered and produced by the Commonwealth was not adequate or sufficient to authorize a verdict of guilty; that the court erred in refusing to direct the jury to find the defendant not guilty and that the verdict was the result of passion and prejudice on the part of the jury.

At the outset, we are of the opinion that the jury was authorized by the evidence to render the verdict they did; that such a verdict, if there was any evidence at all, could not have resulted from passion or prejudice, for the jury gave the defendant the benefit of every doubt and fixed its verdict at two years, the lowest penalty authorized under the law.

The killing of Craig Phelps was witnessed by no one except Nannie Earls, Mary Phelps, and Blain Bolton. The defendant admits that he shot and killed Phelps. Consequently, the only issue that was left for the jury was whether or not the defendant was justifiable or excusable in shooting and killing the deceased under the law of self-defense and apparent necessity. On this question the evidence is conflicting and contradictory; therefore, it was the prerogative of the jury to reconcile the contradictions as to the guilt or innocence of the defendant. There is a sharp conflict in the testimony of Nannie Earls and Blain Bolton in many respects; also, between Nannie Earls and the defendant, as to how the killing occurred. The jury are the sole judges of the credibility of the witnesses, and this court has no right, there being a conflict in the testimony, to take from the jury that prerogative of passing upon the credibility of the witnesses. The jury that tried the defendant has the opportunity and the privilege of observing the witnesses when testifying, noting their deportment, interest, and bias, if any, and possessed the power only of selecting such testimony offered that they believed to be sufficient to establish the truth. In the exercise of that right, they concluded that the defendant was not justified in shooting and killing Phelps, but did believe, however, that the killing was not premeditated, but was the result of a sudden affray or sudden heat and passion. They therefore convicted him of the lesser degree of the charge of the killing; to wit, voluntary manslaughter.

A summary of the facts produced by the record is that Craig Phelps was at the time to some extent under the influence of liquor; that he entertained an antipathy

or dislike for the defendant on account of the improper relations that he thought existed between the defendant and his sister, Mary Phelps; the defendant at the time being a married man. It is in evidence that on a former occasion the defendant had been assaulted by the deceased while under the influence of liquor. The circumstances and facts concerning the assault or encounter between the defendant and the deceased on another occasion were given by the witnesses to the jury without any objection on the part of the Commonwealth, which was in the main incompetent, and which necessarily was to the advantage of the defendant. On the night of the trouble the defendant was at the home of Nannie Earls, a cousin of the deceased, as was Mary Phelps, his sister. He went to the home of his cousin in his shirt sleeves, purporting to be in search of his wife. It was in the month of August and rather warm weather. The door of the home of Nannie Earls was partly ajar. He, without asking permission or giving any notice of his coming into the house, according to the evidence of Nannie Earls, and without knocking, came into the partly opened door sideways. The defendant, at the time, was sitting on the bed on the other side of a radio that was being operated by Mary Phelps. On entering the door he said: "Has Esther been here?" "Esther" was the name of his wife. Her answer was that she had not. At the time he came in he had his hand in his shirt and his shirt was "all bloused out." He was in his shirt sleeves. His right hand was the one he had in his shirt. She exhibited to the jury how he was carrying his hand. The next thing he said, after asking for his wife was that his wife said she was going to Tine Engle's, her father; that he repeated the inquiry about his wife twice, looking all the time at the defendant, indicating that he was about to pull something from his bosom. She told him that his wife was not there; that she had probably "gone to her Daddy's." His sister, Mary Phelps, came to him at that time and had a talk with him. All the time he kept his eyes upon the defendant, who was sitting on the bed, but she never looked down at the defendant at any time; she was watching Phelps all the time; that she heard him say: "Pat, don't you go for that pillow, I am going to kill you"; that Pat was sitting on the bed; had a big pillow sitting up leaning against the bed. She said that was the first word that Phelps had said to Pat. He did not speak to him at any time, but Phelps was standing up by the door facing; that he had never

been any further in the room, just barely inside of the door. She did not see the shooting because she was looking at Phelps. She did see Mary Phelps get up and go to him and heard her say: "Brother, don't do that"; when she did that Phelps "shoved" her away with his loose hand. His right hand was at all times in his bosom. She did not see a gun at any time, but stated that he kept his hand in his bosom all the time he was in the house; that Davis at no time said a word; that when he "shoved" his sister, Mary, out in the floor, he then lost his balance and went up against the door; that he then stepped another step forward and had his eyes in the direction of Davis. She then heard a shot, but did not know who did the shooting at that time; that when the shot fired she was looking right in the face of Phelps. She did not know whether he was shot or whether Mary was shot; that he began sinking and fell down upon the floor; that she put some pillows and quilts under and over him. She did not state at any time who did the shooting because at the time she was looking at Phelps, but heard the shot, and, after the smoke had passed away, she found the deceased was shot and killed. This in substance was her testimony.

Blain Bolton testified that he was a farmer living a short distance from the home of Nannie Earls; that just before the shooting he met Phelps in the highway a short distance from her home and saw him when he went into the home of Nannie Earls; that he started in the door and he heard him ask about his wife; that he, at the time, was about 50 or 60 feet from him. When he asked for his wife, his sister, Mary, grabbed him and said: "Don't you go in there"; that at the time there was a light in the room; that Phelps was at the door, but had never gone inside. The door was halfway open. He only walked up to it. When his sister, Mary, told him not to come in, he heard Phelps use this language: "Pat, don't you come with nothing from under that pillow"; that he did not see Pat Davis at the time. However, when that happened, the gun fired; that the deceased did not engage in any "scuffling" with his sister, Mary; that at the time he had his left hand on the door and when the shot fired he just "scooted" or slid his hand down by the door and "scooted" down in the floor. At that time the door closed. That was in substance the testimony of Bolton.

There was no other testimony except that of the de-

fendant. The defendant, in substance, states that he was at the home of Nannie Earls on that evening; that he had been out riding in his automobile; that he was sitting on the bed in the house; that he had put his pistol behind a pillow near him; that Phelps came there and asked a question that he did not understand; that he was a little hard of hearing; that he heard Mary, his sister, say: "No, she has not been here"; but he did not know what the question was, but heard Phelps say: "By G——, I am going to beat him up"; that he was then sitting on the bed leaning back on his elbow; that he did not know who he was making the statement about when he said that he was going to beat him up but the next thing that took place, Mary got up and said to him: "Oh, no, don't do that"; that he saw him take his left hand and "shove" her and heard him say: "By G——, get out of my way." When she got out of his way, a space was left between them. He came in with his hand in his shirt bosom; but he saw nothing in his hand, but did see a bulk in his bosom pretty large and too big for just a hand. It looked like a pistol of some kind and he believed it was a pistol, and when he pushed his sister away he said: "I am going to burn him up"; he was facing him with his hand in his shirt bosom, his gun lying on the bed. Phelps made a step forward and said: "G—— d—— you, I will kill you," and pulled his arm around; then he fired because he thought he was going to shoot him. He did not know where he hit him and only shot once; said he did not wish to hurt him, but shot him because he thought Phelps was going to shoot him; that he had never done anything to cause Phelps to shoot him, or had made any threats against him. He then left the home of Nannie Earls and went to the home of Mr. Fogel, in whose home he had a room formerly. He stated that in making the trip to Mr. Fogel's he lost his pistol.

For some reason Mary Phelps was not introduced either by the Commonwealth or the defense. In substance, the aforesaid was the testimony of the eye-witnesses.

The testimony of Nannie Earls is so indefinite and fragmentary that it is difficult for the court, after reading it, to know just what she did mean to say. However, we are impressed that she made a supreme effort to avoid making any statement that would be to the detriment of the defendant in proving his defense.

Counsel for the defendant insists that the testimony of Blain Bolton is not worthy of belief; and, in fact, charges him to be a perjurer. This court is unable to consider his testimony in that light. Nannie Earls stated that as Phelps crossed the porch to the door of her home, the defendant announced that they "were going to have company," as he heard the footsteps of the deceased, so it is evident Phelps' coming to the door of Nannie Earls was heard before he entered the door. The witness Bolton stated that he met the deceased on the highway, spoke to him, saw him as he crossed the porch to the door of Nannie Earls, and saw the door was partly open; there was a street light in front and some light in the residence; that he saw Mary, the sister of the deceased, come to the door and insist that her brother not come inside; and, following that, heard the deceased ask the defendant on the inside, through the door, not to take his pistol from the pillow that was near him; and at once the shooting took place. It is in evidence that prior to that time the deceased had assaulted the defendant by striking him with a black jack and had treated him badly. It was the province of the jury to accept the statement of Bolton as reasonable and correct, which they did. If his statement is correct, then the shooting was not in self-defense and the defendant was not excusable in his act. No pistol could be found on his person after he was shot. In fact, it is overwhelmingly shown that he had no pistol at any time.

Counsel for the defendant relies upon the authority of Helton v. Com., 242 Ky. 386, 46 S. W. (2d) 487, and Helton v. Com., 254 Ky. 290, 71 S. W. (2d) 625, as authority for the court to reverse the case. In that case the evidence was entirely circumstantial as to who did the killing. In the instant case it is not a question as to who did the killing, but the question here is, Was the defendant justified in the killing after admitting he did it?

We said in Helton v. Com., 242 Ky. 386, 46 S. W. (2d) 487, 489:

"It is a well-established rule that if proof of guilt of a crime is dependent upon circumstantial evidence which may be as reasonably consistent with innocence as with guilt, it will be held insufficient to support a conviction. Marcum v. Com., 212 Ky. 212, 278 S. W. 611; Fuson v. Com., 230 Ky. 761, 20 S. W. (2d) 742; Denham v. Com., 239 Ky. 771, 40 S. W.

(2d) 384; Tarkaney v. Com., 240 Ky. 790, 43 S. W. (2d) 34, and cases cited therein. On this evidence we could not in good conscience permit the conviction of this man to stand, and must therefore reverse the judgment because the verdict is flagrantly against the evidence.''

The facts in the above case are so dissimilar to the facts in the instant case that the result reached therein cannot be considered as authority here. We think the case of Shepherd v. Com., 236 Ky. 290, 33 S. W. (2d) 4, is complete authority to substantiate the verdict of the jury in this case.

As we said in that case, in substance, the credibility of witnesses is for the jury to judge and a verdict rendered must stand unless it is so palpably against the established facts and circumstances as to compel the conclusion that it resulted from passion and prejudice and was not the fruit of deliberation and judgment.

In this case the jury accepted the evidence of Blain Bolton as being sufficient to rebut the evidence of the defendant and of Nannie Earls. We think the verdict was authorized by the evidence and instructions of the court. No complaint is made of the instructions. A verdict is not palpably against the evidence when it is reasonable for the jury to find from the proven facts and circumstances that the defendant was guilty. The credibility of the witnesses in every instance must be determined by the jury and the jury is at liberty to accept one witness to the exclusion of all others, or to accept a part of the testimony on both sides and reject any portion. This court has no way of knowing the basis upon which the verdict was rested, but, when viewing the whole case, the evidence affords no plain and reasonable grounds upon which the verdict may not be sustained, and it cannot be said as a matter of law that the results reached were palpably against the proof adduced.

When we view the evidence of the witnesses that undertook in this case to state the facts of the altercation that resulted in the death of the deceased, together with other facts as to the relationship between the defendant and the sister of the deceased, and with the further fact of the reluctance of the witness Nannie Earls to state what did occur, the jury would be authorized to reach the conclusion that she attempted in every way possible to make only such statements as to what oc-

curred that would aid the defendant in his defense and in that way fail to tell the truth in full. Also, the jury had the right to judge as to the reasonableness of the testimony of Blain Bolton. His reputation as a witness was not in any respect challenged. It was not unreasonable for him to have met the deceased at the time of night or at the place at which he met him, or to have seen the transaction that took place when he reached the home of Nannie Earls. If his testimony was accepted by the jury, then the verdict is authorized and in no respect could be considered the result of passion or prejudice.

The judgment is affirmed.