**Dewey Estill OWSLEY, Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

June 26, 1970.

As Modified Oct. 9, 1970.

Claude Asbury, Catlettsburg, for appellant.

John B. Breckinridge, Atty. Gen., James B. Wooten, Jr., Asst. Atty. Gen., Frankfort, for appellee.

WADDILL, Commissioner.

The grand jury of Boyd County returned an indictment against Dewey Estill Owsley charging him with the murder of Dale Moore. At his trial he was convicted of involuntary manslaughter and sentenced to serve five years in the state penitentiary.

Owsley appeals and urges several grounds for reversal, one of which is that the evidence fails to establish his guilt beyond a reasonable doubt. However, the Attorney General takes a contrary view and contends that the evidence is amply sufficient to sustain the conviction. To resolve this issue we consider the evidence.

During the night of September 6, 1969, at approximately 11:00 p.m. Dale Moore, Lloyd Bishop and Donald Yates met at a bar in Ironton, Ohio, where they consumed some alcoholic beverages. At about 1:30 a.m. they left Ironton in an automobile to return to Ashland, Kentucky. Bishop was driving, Yates was sitting next to him on the front seat and Moore was occupying the back seat directly behind Yates.

While enroute to Ashland they purchased a case of beer and decided to continue their drinking on a certain hilltop on the outskirts of Ashland located off Donta Road. To reach this hilltop it was necessary for them to drive by appellant's home. Earlier that night appellant and his wife and their niece, Mrs. Josephine Owsley, who had recently divorced Donald Yates, had arrived at appellant's home on Donta Road and had retired for the night.

As Bishop drove past appellant's home, with an open can of beer in his hand, he narrowly escaped having an accident with an approaching automobile which Bishop claimed was driving on his side of the road. In trying to avert the collision Bishop failed to turn off Donta Road to the hilltop where he and his companions had planned to have their beer-drinking party. When Bishop realized this he turned his automobile around and as he was driving by appellant's home for the second time he saw a man standing in appellant's front yard and Bishop thought he heard the man call for help. When Bishop drove back to where the man was standing, Bishop not only realized that the man did not desire help but that the man was loudly abusing him. Bishop accelerated his automobile and proceeded farther down the road where he again turned his automobile around with the intention of immediately returning to Ashland.

When Bishop drove by appellant's home on this occasion he saw no one in the road or in appellant's yard. However, Bishop testified that, just as his automobile passed the place where he had previously seen the man standing in appellant's yard, he heard three gun shots which he thought were fired from a place located to the rear of his automobile. Shortly thereafter Bishop discovered that a bullet had been fired through the back window of his automobile and that the bullet had struck Dale Moore in the back of his head. Moore was conveyed to a hospital where he died the next day as a result of the head wound. Bishop did not see the person who fired the shot and he was unable to identify appellant as the man he had seen in appellant's yard on the night Moore was shot.

Donald Yates' testimony was substantially the same as Bishop's. Both Yates and Bishop testified that they did not know appellant or that he lived on Donta Road.

Appellant was interviewed by the police and he frankly acknowledged that he had become alarmed by Bishop's antics on the night of September 7, and that he had fired three pistol shots into the air to scare Bishop away, but that he did not know that anyone had been injured by the gunfire.

Appellant surrendered his .38 calibre Undercover revolver to the police and disclosed his activities during the night of September 7 through a signed written statement, which was introduced into evidence and in pertinent part reads:

" * * *. At about 3:10 A.M. on Sunday September 7, 1969, I was awakened from my sleep as the result of a car horn being blown excessively. This noise also aroused my niece Josephine [Owsley] who actually awakened me. She was sleeping in a front bedroom. I got up and dressed. I went to the front yard of my residence taking my .38 calibre revolver of Charter manufacture known as an Undercover, with me. The vehicle that was causing this noise was a white over red Ford. I believed it to have had two occupants in the front seat. I observed this vehicle pass in a southerly direction toward Ironville, turn and come back past my house and on the fourth pass I fired my revolver three times into the air, near a large hickory tree. I was standing in in my front yard at the time. My yard is approximately six to ten feet above the roadway. Each time the vehicle passed the house, it gave me the impression that it was going to stop and turn into my driveway. On the occasions that the vehicle passed my house while I was standing in my yard, I called to the occupants, 'what do you want here'? To which they gave no reply. This was done on three occasions. It was on the fourth pass that I fired the gun. I was fully aware of my doings in that I was not intoxicated. I had the opinion by reason of my employment as a bank courier for the American Courier Corp. of Louisville, Kentucky that the occupants may have believed me to have money or other valuables at my home and intended to rob me. I have not in the past had any attempts made to rob me, nor have I had any difficulty with any persons connected with my employment. I have worked for this company approximately 7 years.

"I had no idea at the time who the occupants of the vehicle were. After firing the three shots, to my knowledge, the vehicle did not return, and believing that no one had been shot, I removed the empty cartridge cases from the gun, throwing them on the ground in the yard, and went back into the house. Once inside the house, I reloaded the gun and placed it in a drawer in the dining room where it is usually kept.

"The next thing I knew of this, I received a phone call from Detective Edward J. Kirk of the State Police requesting my presence at the State Police Barracks concerning this incident. I willingly complied with this request. * * *."

A pathologist testified that Moore's death was caused by the gunshot wound in his head. The bullet was removed from Moore's head but it had been fragmented into two missiles that impaired its riflings which are essential in establishing that the bullet had been fired from appellant's pistol. A ballistics expert opined that the missiles removed from Moore's head had either been fired from appellant's gun or a gun very similar to it.

When Mrs. Josephine Owsley was called to testify in behalf of the Commonwealth she refused to answer any of the questions propounded to her by the Commonwealth's Attorney. She claimed that her testimony might incriminate her and she attempted to invoke her Fifth Amendment privilege to remain silent. The trial court did not compel her to answer the questions. Appellant did not testify.

■ In seeking to reverse his conviction appellant relies on the rule that if proof of guilt of the crime is dependent upon circumstantial evidence which is as reasonably consistent with innocence as with guilt, it is insufficient to support the conviction. Helton v. Commonwealth, 242 Ky. 386, 46 S.W.2d 487; Tarkaney v. Commonwealth, 240 Ky. 790, 43 S.W.2d 34. This rule, however, does not govern the instant

case because the evidence obviously incriminated him since it strongly tended to show that appellant had caused Moore's death "by an act creating such extreme risk of death or great bodily injury as to manifest a wanton indifference to the value of human life according to the standard of conduct of a reasonable man under the circumstances," which conduct is denounced by KRS 435.022(1) as involuntary manslaughter. Therefore, we hold that the evidence sustains the verdict and judgment rendered.

Appellant contends that the trial court committed prejudicial error in reading the Fifth Amendment to the jury and to Mrs. Josephine Owsley, in asking Mrs. Owsley if she wanted to be indicted, and in asking her if she was refusing to testify to protect the appellant. The record reflects that after Mrs. Owsley had refused to answer numerous questions by saying "I take the Fifth Amendment," the trial court, in the jury's presence and over the objections of appellant, stated:

"* * *. Before we proceed any further I want to read to you the Fifth Amendment to the United States Constitution. I want you to listen too, Mrs. Oswley. The Fifth Amendment reads, 'no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall he be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation.' This is what this witness has been saying to you. Any further questions of this witness? * *."

The Commonwealth's Attorney then proceeded to continue his examination of Mrs. Owsley as follows:

"Q. In the early morning hours of September 7th, 1969, were you at the home of Dewey Estill Owsley, the defendant in this case out here on Donta Road in Boyd County, Kentucky?

"A. I take the Fifth Amendment.

"BY THE COURT: Wait a minute. It just doesn't mean anything to say, 'I take the Fifth Amendment.' * *.

"BY THE COURT: Do you mean you want to be indicted?

"A. No, I don't want to be indicted. I have committed no crime.

"By Claude Asbury: [Attorney for appellant] Is this a threat from this Court now?

"BY THE COURT: Do you mean that you are in the naval, land or naval forces?

"A. Break that down a little bit so I can understand it.

"BY THE COURT: Are you in actual military service?

"A. No.

"BY THE COURT: Have you been indicted and tried for this offense before?

"By Claude Asbury: Tell him why you don't want to.

"A. Well, I would like to tell the ladies and gentlemen of the jury and also—

"BY THE COURT: Go ahead.

"A. Why I was taking the Fifth Amendment. I was asked Sunday night, you know, the accident occurred, if I did the shooting and yesterday I also was taken in and I was asked the same question if I did the shooting and I did not.

"BY THE COURT: Very well then, if you did not—

"By Claude Asbury: Wait, the Court there—

"BY THE COURT: I am going to ask her. You are objecting. I am going to ask about this.

"By Claude Asbury: I know I am going to ask to set aside the swearing of the jury too.

"BY THE COURT: In other words, are you afraid, are you protecting yourself when you refuse to answer?

"By Claude Asbury: Your Honor, please, I move at this time to set aside the swearing of the jury because the Court in the presence of the jury has asked this woman in essence if she is protecting herself, if she committed this crime and the Court is also an authority on setting aside the swearing of the jury, for the simple reason the Court asked this girl if she wanted to be indicted.

"BY THE COURT: Overruled. Are you refusing to answer in order to protect yourself?

"A. Yes.

"BY THE COURT: Are you refusing to answer in order to protect the defendant, Dewey Estill Owsley?

"A. No, I am not.

"BY THE COURT: Are you willing to tell what you know in this case about the defendant, Dewey Estill Owsley?

"A. I would have to continue to take the Fifth Amendment.

"BY THE COURT: Do you mean that you are refusing to testify to matters that you know in this case in regard to the defendant, Dewey Estill Owsley?

"A. No, I am not.

"BY THE COURT: Will you then testify then to matters in this case that you know about Dewey Estill Owsley?

"By Claude Asbury: If she don't know anything, your Honor, you are asking her questions that is going clear beyond reason here.

"By Eldon Webb: [Assistant Commonwealth's Attorney] If the Court please, the Commonwealth would like to point out that Mr. Asbury represents the defendant. This witness is asserting an individual right separate and apart from the defendant in this case.

"BY THE COURT: Very well, show objection overruled. Are you willing to tell in this case, what you know in this case about the defendant, Dewey Estill Owsley?

"A. I take the Fifth Amendment. * *."

The procedure that the trial judge resorted to was erroneous. Also, the questions he asked Mrs. Owsley and his comments, in the jury's presence, were highly improper and prejudicial. The procedure that should have been followed when Mrs. Owsley declined to answer questions on the ground that it was her Fifth Amendment privilege to remain silent was for the judge to withdraw to his chambers and there permit Mrs. Owsley to state the basis of her claim of privilege. The judge should have then decided, in light of the guidelines laid down in United States v. Thomas, D.C., 49 F.Supp. 547, whether Mrs. Owsley's refusal to answer the questions was justified.

Furthermore, the questions and comments of the trial judge, that were directed in ascertaining whether Mrs. Owsley was trying to protect the appellant, may have had some effect on the members of the jury which was adverse to appellant's interest. Under the circumstances reflected by the record we will presume that the illegal procedure had an effect on the jury to appellant's detriment.

The erroneous procedure that was employed in this case, when considered in connection with the improper questions and comments of the trial court in the jury's presence, causes us to believe that appellant did not obtain a fair trial.

■ Appellant contends that it was erroneous to permit police sergeant Edward J. Kirk to relate to the jury a conversation he had had with Mrs. Josephine Owsley concerning what she knew about the case. When this case is tried again, if Mrs. Owsley testifies and is available for cross-examination and a proper foundation is laid, then prior inconsistent statements of Mrs. Owsley to Sergeant Kirk would be admissible as substantive evidence under Jett v. Commonwealth, Ky., 436 S.W.2d 788. If, however, Mrs. Owsley does not testify, whether this occurs as a result of her claim of privilege to remain silent or otherwise, the testimony of Sergeant Kirk as to such statements would be inadmissible because of the lack of opportunity for cross-examination of Mrs. Owsley and because of the lack of a proper foundation. See Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) as approved in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

Appellant's final contention that the Commonwealth failed to prove the crime had been committed in Boyd County, a question of venue, has been considered and found to be without merit.

■ In the event the evidence is substantially the same upon the retrial of the case, the trial court will give, in addition to those given on the instant trial, an instruction upon accidental killing. See Stanley's Instructions to Juries, Volume 3, Section 887, pp. 190–191. The instructions must not, however, submit or include any issues of appellant's guilt of offenses greater than that of which he was convicted. Price v. Georgia, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (decided June 15, 1970).

The judgment is reversed with directions to set it aside and to grant appellant a new trial.

All concur except Chief Justice EDWARD P. HILL who does not concur in the elimination from the instructions of offenses greater than that of which the petitioner was convicted.