## Toncray v. Commonwealth.

Oct. 6, 1942.

472

Norman W. Bowman for appellant.

Hubert Meredith, Attorney General, and Jesse K. Lewis, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER —Reversing.

The defense of the Bible as better than a patent medicine vendor's sales book was the initial cause of this homicide for which the appellant has been sentenced to five years' imprisonment.

The deceased, John H. Dale, had been conducting a show for about a week in connection with the sale of his medicines on the school grounds of Tollesboro in August, 1940. The appellant, John Toncray, was a merchant in the village. He disapproved the use of the grounds for the purpose and particularly objected to some of Dale's statements as being improper in the presence of the school girls. He had five children attending the school.

On the evening of August 23rd, Toncray closed his store and walked down to the entertainment. One witness testified he said he had come over there to break up the show, but he denied that. Toncray understood Dale to say during the course of his sales talk that his book from which he intended to read was better than all other books, including the Bible. Toncray spoke up: "Hold on, brother, there is no book better than the Bible," or something of that kind, the witnesses differing as to what was said. Dale resented the interruption

and there was some fussing between the men in which Dale publicly abused Toncray, calling him an idiot and a fool. During the tirade Dale declared that he had killed a man for less than what Toncray had done, but some witnesses say the remark had reference to his service in the first World War. Some of Toncray's friends and neighbors told him that he had misunderstood Dale and was in the wrong. He responded:

"If you boys say it is that way, I will go back in the morning and apologize."

According to his testimony, he was getting ready to go to bed when he remembered that he had not put up the bar across the back door of his store or turned out his light or brought his money home. He returned to the store and did those things, taking his money and pistol home as had been his nightly custom for 19 years. This was around 10:30 or 11 o'clock, an hour and a half after the first trouble. He stated he recalled that this was Dale's last night and he would have no opportunity to see him the next morning before he left town. So he went to the school grounds, which seem to be close to his home, and found Dale packing up his effects. According to Dale's widow Toncray said to her husband he had come there to apologize for having created the disturbance, and Dale told him to "Go away and get off my grounds." Toncray said: "You called me some awful names tonight, Mr. Dale." He denied it and again ordered him off the grounds. The defendant and others testified that Dale told him to "forget it" before ordering him off the public school grounds, which he said he had rented. The defendant asked from whom he rented them or what he was paying for the privilege. Lloyd McNutt testified that Toncray had said in connection with his first statement to Dale as to having come to apologize, "You called me some names tonight and I come over to settle with you for it." This witness was the janitor of the school who had rented the grounds to Dale without authority. He admitted having ill feelings against the defendant and his reputation was proven to be bad. But his wife, who was not impeached, also testified the defendant said he had come back to settle for the bad names Dale had called him. The defendant denied this, related his conversation, and described his attitude as having been entirely peaceful and apologetic. Dale's widow and both the McNutts corroborated the de-

fendant that Dale first assaulted him and pursued him, striking him in the face, while he was backing away around the automobile trailer, in which the Dales were living, for a distance of 33 feet. Toncray says that with an oath and threat to kill him Dale reached for his hip pocket. He then drew his pistol and fired, striking Dale in the arm. He continued his pursuit and the defendant fired again, striking him in the breast. This, together with the fact that Toncray made no threat of any kind, is sustained by all witnesses for the Commonwealth. The widow testified, however, that when the defendant fired the third shot Dale was prone on the ground. The defendant says he was getting up and making at him again.

The instruction on self-defense was qualified by another which advised the jury that if they believed from the evidence beyond a reasonable doubt that the defendant, at a time when he was in no danger of death or great bodily harm at the hands of the deceased, had armed himself with a pistol and sought out the deceased for the purpose of bringing on or engaging in a difficulty and killing or injuring him, and with such intention and for that purpose ''used angry or insulting language to said Dale and that he did thereby bring on the difficulty in which said Dale was shot and killed and that the defendant Toncray willingly entered into the conflict with said Dale and willingly engaged in same up to the time he fired the fatal shot that killed the said Dale, then and in that event the defendant Toncray can not justify said killing on the ground of self-defense and apparent necessity therefor.''

The appellant insists that the evidence did not authorize the qualification of his right of self-defense. As stated, two witnesses testified that the defendant had said he had come to ''settle'' the matter. But when that is regarded in association with all the other statements it could hardly have been intended in the colloquial sense of being a challenge rather than in the sense of adjusting the differences amicably. Still, there is the fact that after having gone home the defendant went to his store, obtained his pistol and returned to the scene of the first trouble, sought out the deceased and precipitated the argument as to his right to use the school grounds. The jury might well have believed that the announcement of a peaceful mission was a pretext to conceal an evil pur-

pose. Since the defendant had assumed the role of a "defender of the faith," it is not amiss to suggest the possible application of a classic old Bible story of pretended friendship. Joab, the vindictive nephew of King David and once Captain of his legions, concealed a sword beneath his cloak, went to Amasa, his cousin and successor, inquired as to his health, took him by his beard with his right hand to kiss him, and then stabbed him in the fifth rib and killed him. 2 Samuel, 20:9.

Although the question is a close one, the possibility of these deductions, we think, authorized the qualification of the self-defense instruction. However, there is no evidence justifying the use of the phrase "for said purpose used angry or insulting language to the said Dale." In an instruction qualifying the right of self-defense there should be a reference to the facts of which there is evidence that may have constituted the bringing on of the difficulty. Howard v. Commonwealth, 230 Ky. 738, 20 S. W. (2d) 748, 749. It is error to submit such hypothesis where there is no evidence upon which to base it. Mays v. Commonwealth, 200 Ky. 678, 255 S. W. 257; Menser v. Commonwealth, 201 Ky. 607, 257 S. W. 1038. The gist of the rule which deprives one of the right of defending himself if he was the aggressor is the thing that he did, the overt act or hostile demonstration, which provoked the other party rather than the mere fact that he was present at the place or even had sought out the deceased. Roberson's Criminal Law, Sections 327, 328. We think the evidence did authorize the predicate that "the defendant spoke or used words reasonably calculated to bring on the difficulty or to cause the deceased to assault him." Harris v. Commonwealth, 140 Ky. 41, 130 S. W. 801; Hall v. Commonwealth, 207 Ky. 794, 270 S. W. 35. We realize that technically the stronger terms of the given instruction were more favorable to the accused than these, for unless the jury believed from the evidence beyond a reasonable doubt that he had "used angry or insulting language" he was entitled to kill Dale in self-defense. But the prominence of the phrase directed the minds of the jury to something not in the evidence and its use possibly led them into believing the defendant had in fact used such character of language and thereby antagonized Dale. It is because of the closeness of the question whether any qualification should have been given and the all but overwhelming proof of a justifiable homicide that this technical dis-

tinction is drawn and the given instruction regarded as prejudicial under the elementary rule that an instruction having no basis in the evidence is erroneous.

We do not think that the instruction qualifying the right of self-defense should itself have been qualified, as suggested, upon the theory that, although the defendant may have brought on the difficulty by what he did and said, he had withdrawn from it at the time he shot and killed Dale. The backing away from an assailant while he continues an assault which one may have provoked cannot be regarded as such an abandonment as will restore his unqualified right to defend himself. Hellard v. Commonwealth, 119 Ky. 445, 84 S. W. 329.

The evidence of Dave McNutt that he found no weapon on the wounded man when he arrived at the scene was incompetent, for there had been too many opportunities for the removal of any weapon he might have had. However, others had testified to the same thing and the admission of this testimony could not have been prejudicial. The court properly rejected as immaterial testimony by the county school superintendent that Lloyd McNutt had no authority to rent the grounds to Dale. The defendant had testified that he was hard of hearing and supported that by one doctor. This was obviously for the purpose of showing he had misunderstood Dale's reference to the Bible and had acted in good faith. The rejection of testimony of another doctor to the same effect was error but not a harmful one.

Judgment reversed.