# Toncray v. Commonwealth.

Jan. 18, 1944.

Norman W. Bowman for appellant.

Hubert Meredith, Attorney General, and Jesse K. Lewis, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

This is the second appeal of this case. See Toncray v. Commonwealth, 291 Ky. 471, 165 S. W. (2d) 8, 10, for a statement of the facts which are substantially as in the present record. Upon a retrial of the case Toncray was again convicted and sentenced to six years in the state reformatory. He has appealed, insisting on a reversal of the judgment upon two grounds; (1) That the instruction qualifying the self-defense instruction by which the jury was instructed, in substance, that if Toncray was the aggressor he could not justify the homicide on the ground of self-defense and apparent necessity therefor; and (2) that Toncray's constitutional rights were violated when the officers searched

his home without a search warrant and obtained certain evidence which was used against him upon the trial of the case.

Upon the present trial the court gave the same instruction qualifying the self-defense instruction, omitting therefrom the phrase "for said purpose used angry or insulting language to the said Dale," this being the vice contained in the instruction on the former trial. Since the instruction given in the former trial was approved by this court, except the quoted phrase mentioned above, the opinion in the former appeal is the law of the case, and hence no reversible error was committed in the instructions.

The question of the incompetent evidence presents a more serious question. Toncray testified that after he had had the first controversy with the deceased, Dale, he left the show grounds with a Mr. Moore and Moore told him that he, Toncray, misunderstood Dale and that Dale did not use the language with reference to the Bible that Toncray understood him to use and he then told Moore that he would go back to the show grounds and apologize to Dale. This conversation between Toncray and Moore was at the latter's gate just across the street from Toncray's home. He then went across the street to his home and started to go to bed and had taken off part of his clothes; he looked through the window toward his store and saw that the lights were on and he then recalled that he had not closed the store and he then went to the store and closed it and took the day's receipts from the cash register and also took his pistol from the cash register and put it in his pocket which, he said, had been his custom for the twenty years that he had conducted his store in that village. He said he closed the front door of the store and fastened it with an iron bar on the inside and went out through the back door and that there was a poultry fence at or near the rear of the store and a loose or hanging wire from the fence caught in the seat of his trousers and tore them; he then went to his home the second time and he recalled that that was the last night the deceased would conduct his show at that place and that since he might not be able to see the deceased the next morning he went back to the show grounds to apologize to the deceased on that night, and that he changed his clothes because of the torn trousers before he went back to the show grounds. He then related what occurred when he arrived at the

show grounds substantially in the same language as that contained in the former opinion. The Commonwealth took the position that Toncray changed his clothes for the purpose of concealing his identity from the deceased, rather than because he had torn his trousers, and sought to impress the minds of the jury with the idea that Toncray in fact had not torn his trousers and that his story concerning the tearing of his trousers was untrue and was told for the purpose of concealing the real purpose of changing his clothes. For the purpose of contradicting Toncray's evidence relating to the tearing of his trousers, the court permitted Henry Hardy, who was sheriff of Lewis county at the time of the homicide and deputy sheriff at the time of the present trial, to testify that he saw Toncray's trousers in the home of Toncray on the night of the homicide and that the trousers were not torn. This occurred late in the night and after Toncray had been taken to the county seat and lodged in jail. It was disclosed by the witness' evidence that when he went to Toncray's home he found the door locked and he obtained a key to the house from a neighbor who lived across the street and unlocked the door and entered Toncray's home in search of the trousers. The evidence was objected to upon the ground that the sheriff, Hardy, entered and searched Toncray's home without a search warrant, and hence the evidence was incompetent, and also moved the court to set aside the swearing of the jury, all of which were overruled with exceptions. Later, near the close of the trial, Toncray's counsel again moved the court to exclude Hardy's evidence from the jury for the same reason stated when it was given, and upon reconsideration the court sustained the objection and admonished the jury not to consider Hardy's evidence relating to the condition of the trousers. This evidence was not offered by the Commonwealth in the former trial.

In the opinion in the former appeal it is said: "It is because of the closeness of the question whether any qualification should have been given and the all but overwhelming proof of a justifiable homicide that this technical distinction is drawn and the given instruction regarded as prejudicial under the elementary rule that an instruction having no basis in the evidence is erroneous," indicating that but for the closeness of the question of guilt of defendant the court would not have considered the technical error sufficient to warrant a re-

versal. It is insisted that the same reasoning is applicable in the present appeal. It is argued, and perhaps plausibly so, that because of the statement in the former opinion the Commonwealth's attorney was convinced that the Commonwealth had a weak or doubtful case and he felt constrained to strengthen the Commonwealth's evidence and for that reason he introduced the incompetent evidence complained of, knowing at the time that it was incompetent and prejudicial. It is further insisted that notwithstanding the court's belated admonition to the jury not to consider the incompetent evidence, yet it had already implanted its poisonous fangs in the minds of the jury and influenced them in arriving at a verdict of guilty. This evidence might have had a material bearing on the question of Toncray's motive in returning to the show grounds and if the jury was induced to believe from the evidence of the sheriff that Toncray testified falsely about tearing his trousers, then he would not have hesitated to give false testimony on other phases of the case, and that his real motive in returning to the show grounds and seeking out deceased was not to apologize to him, but was for the purpose of engaging in a controversy with him which, of course, had a bearing on the question as to whether or not Toncray was or might have been the aggressor. We think it is more likely that the jury found a verdict of conviction on the theory that Toncray was the aggressor and for that reason he was deprived of the benefit of the law of self-defense, rather than that he was not in danger of death or great bodily harm at the hands of deceased at the time he fired the fatal shots.

It is the general rule that the error in admitting incompetent evidence is cured by the admonition or instruction that the jury should not consider it, but there are exceptions to the rule, some of which are that when the evidence is of a highly prejudicial nature and calculated to poison the minds of the jury, and in cases where the evidence is close and doubtful. Bailey v. Commonwealth, 294 Ky. 355, 171 S. W. (2d) 1005, 1008. In that case, quoting with approval from the case of Kennedy v. Commonwealth, 14 Bush 340, it was said: " 'what effect it had on the minds of the jury no one can know; * * * it is enough for this court to know that it was wrong, and may have operated to the prejudice of the appellant.' " It is a known trait of the human mind that once an imprint is made on the mind, it is

more or less difficult to rid the mind of it, or to escape its subconscious influence.

In view of the closeness of the case and the further fact that the incompetent evidence was concerning the motive of appellant in returning to the show grounds and seeking out the deceased, we think that it might have had some prejudicial effect on the minds of the jury, notwithstanding the court's belated admonition.

Wherefore, the judgment is reversed and remanded for proceedings consistent with this opinion.

Whole Court sitting, except Judge Rees.