## Daniels v. Commonwealth.

June 21, 1946.

W. A. Daugherty for appellant.

Eldon S. Dummit, Attorney General, and H. K. Spear, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE LATIMER—Affirming.

Appellant, Raymond Daniels, and his two sons, Richard and Tennis, were indicted for the willful murder of Henry Daniels. A separate trial was granted and the appellant, Raymond Daniels, was tried and convicted, and his punishment fixed at confinement in the State Reformatory for life.

To reverse that judgment, appellant prosecutes this appeal alleging eight grounds for reversal. However, he expressly waives numbers 3, 4, 5, 7 and 8, and confines his discussion in his brief to 1, 2 and 6, which are as follows: (1) The verdict of the jury is without sufficient evidence to support or sustain it; is, therefore, flagrantly against the evidence and is the result of passion and prejudice of the jury. (2) The court erred in admitting to the jury for its consideration, over the objection of the defendant, certain irrelevant, incompetent, inflammatory, prejudicial and otherwise inadmissible evidence greatly to the prejudice of defendant's substantial rights. (6) The court erred, at the conclusion of all of the evidence introduced both by the Commonwealth and the defendant, in failing and refusing to sustain the defendant's motion to peremptorily instruct the jury to find him not guilty.

1 and 6 challenge the sufficiency of the evidence to permit a submission of the cause to the jury. The second has to do with the admission of allegedly incompetent, prejudicial and irrelevant evidence.

The appellant, Raymond Daniels, and Henry Daniels were half brothers. They were sons of Charles Daniels, who had been twice married. Henry was a son of the former wife, and Raymond of the latter. It appears that the father, Charles Daniels, died in 1941. Henry paid the father's funeral expenses. He had asked the other children of his father to pay their share of these expenses, which they apparently refused to do. He then

674

undertook to settle his father's estate and to sell a small tract of land which he alleged his father owned. The appellant claimed this tract of land and opposed its sale. After suit was filed, it appears that counsel for Henry employed T. J. Anderson, a surveyor, to survey the land in question, which is located near the home of Henry and the appellant. Their homes were about ¼ of a mile apart and were situated on Tug River facing the river. This appears to be a rather rugged country with the only means of egress being by boat across Tug River and out on the West Virginia side. The means of communication between the Daniels and the neighbors was by footpath along the river bank. The surveyor, Anderson, commenced a survey of the land on September 4, 1945. He first ran a small line for John Daniels and about 2:00 o'clock went upon the lands of Henry Daniels and ran a line for him. There is evidence that Henry's stepmother, who was the mother of Raymond made objection to the running of the line between Henry Daniels and Earl Daniels, and there seems to have been some heated discussion about it. After the completion of this survey, Henry Daniels and the surveyor, Anderson, went to the home of Henry, and after eating their evening meal, sat for a while on the porch. Henry made some remark about some fish traps in the river and invited Anderson to accompany him to see if they had any fish in them. When they reached a point near the river, and while they were viewing the premises, a shot was heard from a point up the river above them. The shot struck Henry on the right side of the backbone and passed entirely through his body. He fell and died within a few minutes.

Anderson testified that he looked toward the place from where the shot rang out but saw no one. He immediately made his way up a little drain and out to Henry's house, which was about 300 feet away, where he informed Henry's wife of what had happened. Mrs. Daniels went immediately down the path toward the body of her husband and before reaching the body she states she saw Raymond Daniels standing looking toward where her husband was lying, and that he had a long gun held in both hands; and that upon seeing him she immediately fell to the ground and out of his vision. The surveyor corroborates her in the statement that she fell to the ground.

The appellant and his eldest son were not at home the day of the survey, both of whom were employees of the Norfolk and Western Railway, a railroad that parallels Tug River on the West Virginia side. The appellant had worked something over 10 hours that day and established by the timekeeper of the railroad that he had worked actually 10 hours and 25 minutes, and had worked until sometime after 6:00 o'clock. The appellant states, and is corroborated by the other members of the family, that he reached home shortly before 7:00 o'clock on the evening of September 4, washed, and ate his evening meal, and then he and his son sawed some firewood to be used for cooking the following day, after which he went to bed.

The record discloses, however, that the younger son, Tennis, was present with the surveyor and the others during the survey. After Henry had been shot word was conveyed to the officers of the county, and deputy sheriffs, Taylor Hatfield and James Alley, and L. E. Burchett, special officer of the Norfolk and Western Railroad, started to the scene of the shooting. By inadvertence they came first to the home of the appellant, who was in bed, at which time they informed him of what had happened to Henry and that they were on the way to Henry's house. Raymond remained in bed. The officers then went to Henry's place and after a short while returned to Raymond's house to inquire about a high powered rifle. Raymond stated that he hadn't had one for 10 years. He told the officers if they thought he had one for them to search and see if they could find it. Apparently satisfied, the officers left but returned again about 1:00 o'clock for further interrogation about the high powered rifle. On this visit they did make search and in an out house they discovered what was apparently a fresh pile of coal dust or slack, and digging in they found a number of high powered cartridges with some other shells. Upon returning to the house, they asked Raymond where the pistol was which shot those shells and where the high powered rifle was. Whereupon, Raymond's wife immediately went back to this coal house and got the revolver which she claims to have taken from under the pillow of Raymond, together with the cartridges obtained from a chest drawer, and had hidden them. No rifle was found. A high powered empty rifle shell was found near the place from which

the shot came. There was evidence that Raymond had been seen within the past few months prior to the shooting with a high powered rifle. Henry's wife testified that Raymond had not spoken to her husband for two years. This, however, was denied by the appellant, who testified there were no bad feelings at all.

Henry's son, in company with two or three others, early on the morning following the shooting, made exploration, and examination of the point from where the shot came, and they found some tracks about 50 yards from where Henry was shot and from that point followed the tracks to the river where they were lost, and on the opposite side of the river they picked up the tracks again and followed them back down to the landing opposite the home of Raymond Daniels. These, in substance, are the salient facts in this trial.

The appellant takes the position that the story of Mrs. Henry Daniels was a preposterous and ridiculous story. He insists it is unreasonable to believe that after ambushing a man, the appellant would have remained in plain view and in the position she described, throughout the length of time required for the surveyor to get the information to her and for her then to reach the point where she claimed she saw him. The appellant further insists that Henry's wife had made statements that she saw no one and didn't know who killed her husband. She denied this but the appellant introduced witnesses who testified she did tell them that, but that is a matter that goes only to the credibility of the witnesses. Contrary to the statement that he had not had a high powered rifle in his home for 10 years, the appellant admitted that he had one such gun borrowed from his nephew, Roy Daniels, which Roy had taken home sometime possibly a year previous to this shooting, thus he explained the presence of the high powered shells.

Counsel argues under ground 2 above that incompetent evidence was introduced by the Commonwealth over appellant's objection and exceptions. He insists that the evidence concerning the sound of the rifle; the shell found near the scene of the shooting, and the evidence concerning the tracks was incompetent. It is true that the tracks were found on the following morning soon after sun-up, which was a considerable time after the shooting, but the time that had elapsed was during the

night time and it is hardly probable, due to the inaccessibility of the place, that there could have been any other passing in the period between the shooting and the early morning. Evidence concerning tracks found shortly after the crime is competent. See Elmore v. Commonwealth, 282 Ky. 443, 138 S. W. 2d 956. Annotations in 21 A. L. R. 204.

The surveyor, Anderson, testified that he knew how a high powered rifle sounded, and his testimony concerning that was competent. See 20 Am. Jur., Evidence, Section 888.

The shell found near the scene of the shooting was the same caliber of shell as those found in appellant's home. They were high powered rifle shells.

Counsel for appellant is very insistent that the testimony of Mr. Alley, who testified that on the first trip made to the appellant's home he saw three guns on the wall of the appellant, one of which was a high powered rifle, but that on the second trip to appellant's home the rifle had disappeared, was incompetent. Counsel complains particularly about the following portion of the testimony and insists that it was highly prejudicial:

"Q. You just won't be positive there were three guns there, will you? A. Yes, but after we left—I will explain."

Counsel responded: "I don't want that."

Then the Court said: "Let him explain. Go on and explain."

To this action of the Court, counsel promptly objected and excepted, and the witness answered: "Well, the only thing I wanted to explain, after we left the room I mentioned this rifle to Taylor and Mr. Burchett." Then the Court said: "I will exclude that. Don't consider it." Appellant insists that after the witness had said "after we left" was notice that what he was going to say would have been outside of the hearing of the appellant, and that the witness should have been promptly stopped, but at the suggestion of the court, even after counsel for Commonwealth said, "I don't want that," he was permitted to explain. It is insisted that even though the court promptly excluded the explanation and instructed the jury not to consider it, the damage was already done.

Generally the error in admitting incompetent evidence is cured by admonition. However, there are exceptions to the rule. If the evidence is so highly prejudicial in nature and calculated to poison the minds of the jury, and make an impression upon the mind difficult to erase, then the admonition is not sufficient. See Toncray v. Commonwealth, 296 Ky. 400, 403, 177 S. W. 2d 376. The fact that he had undertaken to convey this information to others immediately afterwards did not operate to strengthen to any material degree the positive statement that he had seen the rifle on the wall. This is a character of incompetent evidence that an admonition will reach. There is no merit therefore, in the contentions under ground number 2.

Considering all of the evidence then as to its sufficiency in permitting a submission to the jury, we find: A dispute originally over the payment of the funeral expenses of a father; a lawsuit involving land claimed by the appellant; a commencement of a survey of that land on the day of the shooting; the appellant's son present during that survey, which knowledge could easily have been communicated to the father upon his return from work; positive testimony by the widow of the deceased man that she saw the appellant with a long barreled gun in his hand looking toward the place where she found her husband lying; that upon seeing him she immediately dropped to the side of the path, corroborated in this statement by a disinterested witness, the surveyor; an empty cartridge shell found near the scene of the shooting of the same caliber as the cartridge shells found concealed at the appellant's home under coal dust; tracks leading from the spot from which the shot apparently was fired; and the unexplainable attitude of the appellant when first informed that his brother had been killed. He says that he was informed that both John and Henry had been killed, but yet he didn't get out of bed. The most unreasonable part of it all was that he thus remained in bed when the natural, normal, reasonable, thing to have done would have been to jump from bed and go hurriedly to his brother's home.

The finding of the ultimate fact from conflicting testimony is a function imposed by law upon the jury. They, too, are the judges of the credibility of the witnesses. The verdict of the jury must stand unless palpably against the facts and circumstances, and so much so as

to compel the conclusion that it resulted from passion and prejudice. See Pearson et al. v. Commonwealth, 295 Ky. 616, 175 S. W. 2d 33; Davis v. Commonwealth, 270 Ky. 53, 109 S. W. 2d 2; Carter v. Commonwealth, 278 Ky. 14, 128 S. W. 2d 214.

We conclude, therefore, that the alleged errors relied upon by appellant are not sufficiently meritorious to warrant a reversal herein.

The judgment is affirmed.