# Woods v. Commonwealth.

March 4, 1949.

Rehearing denied June 24, 1949 .

George T. Ross and Thomas D. Shumate for appellant.

A. E. Funk, Attorney General, Zeb A. Stewart, Assistant Attorney General, and R. R. Craft, Commonwealth Attorney, for appellee.

OPINION OF THE COURT BY JUDGE LATIMER—Reversing.

Amos and Johnny Woods, brothers, were indicted jointly for the crime of murder. They moved for separate trials and the Commonwealth elected first to try Amos. He was convicted of voluntary manslaughter and his punishment fixed at confinement for 21 years. He prosecutes this appeal alleging 14 grounds for reversal, many of which overlap and can readily be condensed into 6 chief grounds, namely: (1) The dying statements of Tommy Ashcraft did not meet the tests necessary for admission as evidence as a dying declaration. (2) The court should have sustained motion peremptorily to instruct the jury for the defendant. (3) The admission of incompetent evidence. (4) A witness cannot be contradicted or impeached by interrogating him concerning irrelevant matters or incompetent evidence admitted on a former trial. (5) Erroneous instructions, and (6) Improper argument of the Commonwealth Attorney.

The evidence discloses that the defendant, his father, Floyd Woods, and the deceased, Tommy Ashcraft, were workmen employed on the farm of Stanley Lakes. The injuries which resulted in the death of Tommy Ashcraft occurred on August 21, 1947. As far as the Commonwealth is concerned the only evidence as to how the difficulty occurred was the statements made by Tommy Ashcraft a few hours prior to his death.

Appellant insists that those statements by no means meet the tests of a dying declaration, first, because it is claimed Ashcraft was drunk; second, because according to the statements of the doctors, he was either unconscious or semi-conscious at all times up to the time of his death; and, third, because the statements were not made in the apprehension or fear of impending death.

Stanley Lakes, who went to the Gibson Hospital to see Tommy Ashcraft, stated that Ashcraft said to him: "Stanley, they tried to kill me and they made a good job of it."

Ruby Ashcraft testified that her husband said to her: "I am killed. I will never get over this," at which time he looked at his mother and said: "Ma, I want you to help take care of my children. I am not going to be here long."

The deceased then undertook to tell the circumstances of his injury. He stated that the two Woods brothers got into a fight with Floyd Woods, their father, and that the father called for him (Ashcraft) and that he said to the Woods boys: "Boys I wouldn't do this" and that Johnny cut him and Amos hit him over the head with a pistol.

Dan Wilson, a highway patrolman, testified that on Saturday morning about 10:00 A. M. he went to the Gibson Hospital to see Tommy Ashcraft and when asked what statement Tommy Ashcraft made, he replied: "Well, he said he had been beaten to death, that he wasn't going to get well." In reply to questions asked by Wilson, Tommy Ashcraft told of the circumstances of his injury in substance as he had related above to his wife.

Appellant raises the frequently voiced objection to admission of the above as dying declarations because of the lurking dangers of that character of evidence in that it is without the sanction of an oath or the fear of penalty for perjury, and admits of no opportunity of cross-examination. These objections have been heretofore carefully considered in most, if not all, jurisdictions and almost universally rejected. Generally the conditions on which admissibility depends are that the declarant is conscious of impending death and that the declaration relates to facts concerning the injury or death and not to declarant's opinion or conclusion, and the facts so related must be such as could have been given in evidence by the deceased had he lived. Careful examination of the testimony herein convinces us that the above conditions have been fully met and that the statements as made are admissible as a dying declaration.

For the purpose of ascertaining whether or not there is merit in appellant's contention that he was entitled to a peremptory instruction, we will look to the defendant's version of the trouble. Defendant, testifying for himself, denied that there was any trouble or fight between him and his father, or between him and his brother, Johnny. He denied that he had any difficulty whatsoever with Ashcraft. He stated, in substance, that he, his father, and Tommy Ashcraft were working on Lakes' barn on the day of the trouble and that when they quit for their noon lunch, in compliance with the request of Ashcraft, his brother, Johnny, took Ashcraft somewhere in his car; that upon their return they came to the barn where he and his father were working; and that Ashcraft had a ½ gallon jar with some liquor in it. He stated that Johnny and Tommy sat around the barn talking and drinking, and that sometime later, when rain prevented further work on the barn, he and his father went to his father's house, leaving Tommy and Johnny at the barn. Amos stated that he remained at the house and his father went to the cow pasture and in about half an hour his father came running and said: "Lord God come on your brother is dying." He stated that he immediately went to Lakes' barn, near which he found his brother lying on the ground bloody and with a cut on the back of his head, and Ashcraft lying nearby in a similar condition to that of Johnny's; that after placing his brother in the car he rushed with him to the hospital; that at the hospital he told a State Highway Patrolman that Tommy Ashcraft was hurt; that he returned to where Ashcraft was lying; that the patrolman and a little boy helped him put Tommy in the car; and that he drove him to a hospital in Richmond.

Johnny Woods, testifying in behalf of his brother, gave the following account of the difficulty.

"We walked up to the barn and after we got to the barn Tommy sat down there. He offered me a drink of whiskey. He said, 'look what I've got, that's good stuff.' I took a drink with Tommy. We sat there and laughed, and talked, in the meantime my dad and brother were cleaning out a corn crib, tools crib. There came up an awful rain, my brother asked me in the meanwhile for the automobile that he wanted to take his children

in for a hair cut. My brother and dad went to the house together. My brother stayed at the house to help clean up the kids to bring them to town. My dad went to the house for his boots. It was awfully muddy. When he came back, he said, 'Johnny, come on I want to show you the cows.' Tommy and I sat there together, took another drink together. I started to the milk gap to see my dad's cows. When I did that Tommy followed me. When we got to the milk gap he said, 'do you want to take me to Bearwallow to get some more whiskey, I got it paid for.' I said 'no,' and he shoved me against the barb-wire fence. I shoved him back. He pulled a knife, had a knife in his hand, and said, 'if you don't take me to Bearwallow I will cut your heart out.' I wheeled to run. Just as I did he struck me in the shoulder with his knife. I felt the blade. I kept running. There was a milk stool setting there, I got hold of that and swung it at him three or four times. I knocked him down. I slipped myself and he grabbed me around the waist. He cut me and I grabbed him by the hair of the head. I struck at his chin. I kept stabbing him in the back. I went down. He stabbed me in the back and I went down, that is the last I remember until I was at the hospital.''

Since we have determined that the statements of Ashcraft are admissible as a dying declaration, we have two versions as to how the difficulty arose and the injuries occurred. It is clearly apparent that this was a question for the jury.

Complaint is made that the combination of murder and manslaughter, in one instruction was confusing to the jury. There is no merit in this contention. This instruction is substantially in the form heretofore approved by this court. See Stanley's Instructions to Juries.

The incompetent evidence covers a variety of things, apparently chief of which is the introduction of the pistol that was shown to the dying man for the purpose of identification. It is insisted that this pistol was obtained without a search warrant. It will be observed that the testimony concerning the pistol was not an essential part of the crime, therefore the rule concerning its procurement without search warrant does not apply. We have

carefully considered the evidence alleged to have been incompetent and we find no merit in this contention. Possibly some of the evidence was immaterial but we are not disposed to say it was prejudicial.

Complaint is made of the line of questioning wherein the Commonwealth Attorney undertook to contradict Johnny Woods and impeach him by asking him questions concerning irrelevant matters and incompetent evidence admitted on a former trial. We have carefully looked at this evidence and the questions propounded were concerning testimony as to how Johnny obtained a U-Drive-It car in which he drove from Louisville to his father's home. True, this evidence also was immaterial and ordinarily a person cannot be contradicted or impeached by questioning him concerning irrelevant matters, but certainly this cannot be held as prejudicial.

Complaint is next made concerning the argument of the Commonwealth Attorney, to which objections were made by defendant, and which were overruled by the court. Herein we find a more serious matter. As shown by both the motion and grounds for new trial and bill of exceptions, the Commonwealth Attorney in his argument frequently referred to and often repeated the statement that Johnny Woods had been tried in Louisville Police Court; that in a former trial of the instant case Johnny denied having been tried in Louisville Police Court; and that Johnny stated he rented a U-Drive-It car in Louisville when in fact he hadn't. The Commonwealth Attorney then said to the jury that if the witness, Johnny Woods, would testify falsely concerning a trial in the Louisville Police Court and the renting of a U-Drive-It car in Louisville, he would testify falsely about everything in this case. It is apparent that since Johnny Woods, according to the version of the defendant, was the only person present when Johnny and Tommy Ashcraft had the fight in which Johnny was seriously wounded, and Ashcraft fatally so, the destruction of his credibility could certainly have a most devastating effect upon his version of the trouble. The Commonwealth Attorney went entirely outside the record in this trial and referred to incompetent evidence admitted on a former trial concerning the convictions of misdemeanors in Louisville. The statement that if Johnny would lie

about one he would lie about the other could obviously be extremely disastrous and consequently very prejudicial. We have condemned such argument. See Grigsby v. Commonwealth, 299 Ky. 721, 187 S. W. 2d 259, 159 A. L. R. 196, and Toncray v. Commonwealth, 296 Ky. 400, 177 S. W. 2d 376. This is another instance where the Commonwealth Attorney in his zeal has gone outside the record, no doubt with good intentions, and made such prejudicial arguments as to necessitate a reversal.

Wherefore, the judgment is reversed.