Jasper **POLLINI**, Appellant,

v.

**COMMONWEALTH of Kentucky,** Appellee.

No. 2003–SC–0552–MR.

Supreme Court of Kentucky.

Sept. 22, 2005.

Frank Wm. Heft, Jr., Louisville, KY, for Appellant.

Gregory D. Stumbo, Attorney General, Ian G. Sonego, Assistant Attorney General, Criminal Appellate Division, Frankfort, KY, for Appellee.

Opinion of the Court by Justice GRAVES.

A jury of the Jefferson Circuit Court convicted Appellant, Jasper Pollini, for the crimes of murder (complicity), first degree burglary (complicity), second degree burglary (complicity), and receiving stolen property over $300 (complicity) in connection with an early morning burglary spree which culminated with the murder of Byron Pruitt. During the sentencing phase, the jury found as an aggravating circumstance that Appellant murdered Pruitt while he was engaged in the commission of a first degree burglary and fixed Appellant's sentence for the murder of Pruitt at life imprisonment without the benefit of parole for twenty-five (25) years. Appellant was also sentenced to fifteen (15) years, ten (10) years, and one (1) year, respectively, for the remaining crimes, with such sentences ordered to run concurrently with the sentence on the murder conviction. Appellant now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). For the reasons set forth herein, we affirm all of Appellant's convictions in this case, but vacate the sentence imposed on the murder conviction and remand for a new penalty phase trial on noncapital murder.

In the early morning hours of May 7, 2002, Appellant, who was seventeen years old at the time these crimes were committed, broke into Brian Murphy's garage and stole some tools and a generator. Apparently unable to transport the generator, Appellant returned to his nearby home and sought the assistance of Jason Edwards, the boyfriend of Appellant's sister, Crystal Plank. Edwards drove Appellant back to the area and the pair loaded the generator from Murphy's garage into the trunk of Edward's car. Appellant told Edwards to stay in the car and then proceeded to use a screwdriver to break into the nearby garage of Dan Ziegler.

Ziegler awoke shortly after 5:00 a.m. to the sound of his alarm system beeping. While investigating the source for the alarm, Ziegler went into his garage and saw Appellant. Ziegler testified that he perceived Appellant to have a weapon in his hand, but was not sure what it was. Ziegler told Appellant to stop what he was doing or he would "blow his head off." Appellant fled from the scene and was chased into some nearby woods by Ziegler. Ziegler testified that he soon heard a car drive away after losing sight of Appellant in the woods. After returning to his home, Ziegler called 911 and his neighbor, Byron Pruitt, to report the incident and to advise Pruitt to check his property. After talking with Ziegler, Pruitt armed himself with an automatic pistol and a flashlight and began investigating the area.

Meanwhile, Appellant and Edwards drove back to Appellant's house. Edwards removed the generator from his car, covered the car, and then went into the house. Shortly after retreating into the house, Appellant asked Edwards to take him back to Ziegler's residence to retrieve a toolbox he had left at the scene. When Edwards refused to return to Ziegler's residence, Appellant persuaded his sister, Crystal Plank, to drive him back to the scene to retrieve his toolbox.

Between sixteen and thirty minutes after first being confronted by Zeigler, Appellant and Plank returned to the scene of the burglaries. Appellant stated that he armed himself with a semi-automatic pistol immediately before his return to the scene of the crimes because he had been threatened by Ziegler. Upon their return to the scene, Appellant instructed Plank to turn off the lights on the car because he was about to get out to retrieve the toolbox. As Plank stopped the car, she observed a flashlight coming toward the car. Appellant hurriedly instructed Plank to back up; however, Plank had difficulty doing so due to poor visibility. Appellant then fired his gun out the window of Plank's vehicle and the bullet pierced Pruitt in the throat. Pruitt died shortly thereafter from his injury. Immediately after the shooting, Appellant and Plank fled the scene, but were apprehended, along with Edwards, later that day.

Appellant asserts nine assignments of error upon which he requests relief. We address each assignment of error in turn:

## I. Voir Dire Questions

■■■■■ Appellant argues it was prejudicial error for the trial court to ask each prospective juror the following question, "If you are on the jury, do you have any moral or religious or conscientious objections that would prevent you from considering the death penalty as a punishment and imposing it if you believe it appropriate?" The extent and appropriateness of questioning during *voir dire* is a matter within the sound discretion of the trial court. *See Woodall v. Commonwealth*, 63 S.W.3d 104, 116–118 (Ky.2002); *Tamme v. Commonwealth*, 973 S.W.2d 13, 25 (Ky. 1998); *Grooms v. Commonwealth*, 756 S.W.2d 131, 134 (Ky.1988).

Appellant first asserts error in the trial court's use of the word "impose" because such a word implies that the jurors must commit themselves to use of the death penalty later at trial. We disagree. The full context of the trial court's question reads, "any ... objections that would prevent you from *considering* the death penalty ... and imposing it *if you believe it appropriate?*" (Emphasis added). When considered in its proper context, we find that the trial court's question does not imply an improper premise nor is it likely to be misleading to a reasonable juror. *See Wheeler v. Commonwealth*, 121 S.W.3d 173, 179 (Ky.2003) (jurors who could not impose the death penalty were properly stricken for cause); *Caudill v. Commonwealth*, 120 S.W.3d 635, 654 (Ky.2003) (potential jurors may be excused for cause if the potential jurors are biased against imposition of the death penalty).

■■■■■ Appellant also asserts error with respect to the trial court's question regarding whether the jurors had any "moral or religious or conscientious objections that would prevent" consideration of the death penalty as a punishment. Appellant argues such an inquiry violates the jurors' rights to religious freedom under the Kentucky and United States Constitutions. This issue was not preserved and is raised by Appellant as palpable error under RCr 10.26. Appellant concedes that we addressed and rejected essentially the same argument in *Parrish v. Commonwealth*, 121 S.W.3d 198, 202 (Ky.2003) ("There was no violation of any provision of either the federal or state constitutions" when the trial court asked each prospective juror "if they held any moral, religious, spiritual or personal beliefs that would interfere with their service as jurors on this death penalty case."), but nonetheless urges reconsideration of the issue. After careful review, we find the totality of the circumstances in this case do not compel reconsideration of this issue and thus, we find no palpable

error in the trial court's *voir dire* question as cited above.

## II. 911 Tapes

Appellant next argues that a tape recording of 911 telephone calls made by Ziegler during the course of events in this case should have been excluded from evidence because they were merely cumulative and overly prejudicial to Appellant. "It is well settled that the admission of tape recordings at trial rests within the sound discretion of the trial court." *Johnson v. Commonwealth*, 90 S.W.3d 39, 45 (Ky.2002) (quoting *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir.1983)); *see also Cook v. Commonwealth*, 129 S.W.3d 351, 361 (Ky.2004) ("The outcome of a KRE 403 balancing test is within the sound discretion of the trial judge, and that decision will only be overturned if there has been an abuse of discretion, i.e., if the trial judge's ruling was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.").

The tape recording introduced at trial contained three telephone calls made to 911 by Ziegler on the morning of Pruitt's death. The recording reflects that at 5:47 a.m. Zeigler called 911 to report a break-in to his garage and that the suspect had subsequently fled from the scene. A second call made at 6:04 a.m. by Ziegler reported that he had heard a gunshot and someone yelling for him. The tape then reflects Ziegler observing Pruitt coming towards him, having been shot in the throat, and the 911 operator instructing Ziegler to hold a cloth to Pruitt's throat to stop the bleeding. During this call, Pruitt can be heard in the background emitting sounds as a result of his fatal injury. A third call was made by Ziegler after he had assisted Pruitt.

Rule 403 of the Kentucky Rules of Evidence states, in part, that relevant evidence may be excluded by the trial court if the "probative value [of the evidence] is substantially outweighed by the danger of undue prejudice." Alternatively, the trial court may exclude relevant evidence where the presentation of such evidence is merely cumulative and thus, unnecessary for a full understanding of the case. Appellant asserts that since Ziegler had already testified about the dramatic events which were partially captured within the calls he made to 911, the tape recording was merely cumulative and had little to no probative value. Appellant further asserts the tape recording was overly prejudicial because the tape recording impermissibly bolstered Ziegler's prior testimony and audibly portrayed suffering by Pruitt as he was dying. We disagree.

It is generally accepted that evidence depicting gruesome, heinous, or unsettling portrayals of the crime or of the victim, while prejudicial to the defendant, is not excludable from the consideration of the jury unless such evidence becomes *overly* prejudicial to the defendant because it is (1) irrelevant; or (2) relevant, yet unnecessary for a full understanding of the case. *See Johnson v. Commonwealth*, 105 S.W.3d 430, 438 (Ky.2003), *Barnett v. Commonwealth*, 979 S.W.2d 98, 102 (Ky. 1998). In this case, while Ziegler had previously testified regarding the events he witnessed and the calls he made to 911 the morning of Pruitt's death, he could only estimate the approximate time sequence for these events and calls. The 911 tape recording established the exact times for the calls made by Ziegler and functioned to put the sequence of events into context for the jury. Accordingly, we find the 911 tape to have probative value and reject the suggestion that it is impermissibly cumulative. *See Young v. Commonwealth*, 50 S.W.3d 148, 169 (Ky.2001)

(videotape of death throes of victim relevant to prove *corpus delicti* ).

 Appellant argues, nonetheless, that the prejudicial effect of the tape recording could have been greatly diminished if the Commonwealth had accepted the defense counsel's offer to stipulate the time sequence of Ziegler's 911 calls. This Court has repeatedly held that "a stipulation offer cannot provide the foundation for a KRE 403 argument on appeal" because "the prosecution is permitted to prove its case by competent evidence of its own choosing, and the defendant may not stipulate away the parts of the case that he does not want the jury to see." *Johnson v. Commonwealth*, 105 S.W.3d 430, 438–39 (Ky.2003) (quoting *Barnett v. Commonwealth*, 979 S.W.2d 98, 103 (Ky.1998)). We must therefore review the evidence as it was presented by the Commonwealth and not how it might have been presented. When the probative value of the 911 tape recording is considered in light of its potential prejudice to Appellant, we find no abuse of discretion by the trial court when it allowed the tape recording to be played to the jury.

### III. Transfer of charges from juvenile to circuit court

Appellant next argues that indictment 02–CR–1632, charging him with second degree burglary and receiving stolen property in connection with the burglary of Murphy's garage, was improperly tried in circuit court. Because Appellant was seventeen years old at the time these crimes were committed, juvenile court was granted exclusive jurisdiction over the matters unless and until the matters were properly transferred to circuit court pursuant to KRS 635.020 and KRS 640.010. *See Osborne v. Commonwealth*, 43 S.W.3d 234, 238–39 (Ky.2001).

In this case, Appellant concedes that a juvenile transfer order properly conferred jurisdiction of the murder charge and the first degree burglary charge involving Ziegler's garage to circuit court. Subsequent to this transfer order, second degree burglary and receiving stolen property charges involving Murphy's garage were brought directly in circuit court and consolidated with the previous charges contained in the juvenile transfer order. At trial, Appellant requested both a directed verdict and a dismissal based on the premise that jurisdiction for the subsequent charges was never conferred on the circuit court.

 Citing *Commonwealth v. Varney*, 690 S.W.2d 758, 760 (Ky.1985) and RCr 8.18, the Commonwealth initially argues that Appellant's motions during trial were untimely and, therefore, the issue was not properly preserved for review because Appellant failed to challenge the validity of the subsequent charges by motion prior to trial. We disagree. RCr 8.18 states, in part, "Defenses and objections based on defects in the institution of the prosecution or in the indictment or information *other than that it fails to show jurisdiction in the court* . . . may be raised only by motion before trial." (Emphasis added). RCr 8.18 goes on to instruct that "lack of jurisdiction . . . shall be noticed by the court at any time during the proceedings." Whether the subsequent charges were within the scope of the juvenile transfer order is clearly jurisdictional in nature and thus, RCr 8.18 does not preclude, but rather preserves, review of this issue. The Commonwealth's reliance on *Varney* is similarly misplaced since that case dealt with a defendant's failure to timely object to a defect in an indictment that was completely unrelated to whether the circuit court had jurisdiction to try the actual offenses. 690 S.W.2d at 760.

■ Having found the issue to be properly preserved, we now consider whether the circuit court had jurisdiction to try the second degree burglary and receiving stolen property charges involving Murphy's garage. Juveniles, such as Appellant, who are alleged to be youthful offenders pursuant to KRS 635.020 are entitled to certain procedural safeguards, such as a preliminary hearing, before jurisdiction can be properly transferred from juvenile court to circuit court. KRS 640.010. Despite the holding of proper transfer proceedings for the murder and first degree burglary charges involving Ziegler's garage, Appellant asserts it was error to bring the subsequent charges directly in circuit court. Rather, Appellant argues the charges should have been filed in juvenile district court and properly transferred through the holding of a second set of transfer proceedings in accordance with the procedures set forth in KRS 640.10. We disagree.

In *Osborne v. Commonwealth*, 43 S.W.3d 234, 238 (Ky.2001), this Court stated that "it is the offender that is transferred to circuit court, not the offense." Accordingly, subsequent charges against a youthful offender may be brought directly in circuit court without conducting a second set of transfer proceedings if (1) proper juvenile transfer proceedings have previously been held and a valid transfer order from those proceedings has been entered; and (2) the subsequent charges "aris[e] out of the same course of conduct that gave rise to the offense that caused the child to be transferred to circuit court." *Id.* Appellant argues that in order for charges to fall within the parameters of being within the "same course of conduct that gave rise to the offense that caused the child to be transferred to circuit court," all the charges must involve the same victim.

After careful review of KRS 610.015(2) and KRS 635.020(8), we find the standard articulated in *Osborne* extends beyond just those offenses which involve the same victim. KRS 610.015(2) states, "The Circuit Court shall try all misdemeanor, violation, traffic offense, and status offense matters included in or which arise from the act or series of acts which result in the trial of a child as an adult in the Circuit Court." KRS 635.020(8) reads in similar fashion, "All offenses arising out of the same course of conduct shall be tried with the felony arising from that course of conduct, whether the charges are adjudicated under this chapter or under KRS Chapter 640 and transferred to Circuit Court." From these statutes, we interpret the term "same course of conduct" as it was utilized in *Osborne* to encompass all conduct which results in charges which may be tried against the juvenile at the same time as the charges that caused the juvenile to be transferred to circuit court. *See* RCr 6.18 (allowing offenses to be charged in the same complaint, indictment, or information if they are "of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan") and RCr 9.12 (allowing offenses to be tried together if they could have been joined in a single complaint, indictment, information or uniform citation).

In this case, the burglary of Murphy's garage was part of a continuous and uninterrupted crime spree which culminated with the murder of Pruitt. The entire sequence, beginning with the break-in to Murphy's garage and ending with the death of Pruitt, lasted no longer than a few hours. These actions were interrelated enough to be joined at trial and as such, they were interrelated enough to constitute the "same course of conduct" as it is defined in *Osborne*.

## IV. Jury Instructions

 Appellant first asserts that his right to a unanimous jury verdict was violated in this case when the trial court instructed the jury on alternate theories of wanton and intentional murder. In *Davis v. Commonwealth*, 967 S.W.2d 574, 582 (Ky.1998), we explained:

Nothing less than a unanimous verdict is permitted in a criminal case. Unanimity becomes an issue when the jury is instructed that it can find the defendant guilty under either of two theories, since some jurors might find guilt under one theory, while others might find guilt under another. If the evidence would support conviction under both theories, the requirement of unanimity is satisfied. However, if the evidence would support a conviction under only one of two alternative theories, the requirement of unanimity is violated.

*Id.* (citations omitted).

 Appellant objected to the jury instruction at trial, arguing there was insufficient evidence to support a theory that Appellant intentionally murdered Pruitt. When determining whether it was error for the trial court to submit a specific theory to the jury, this Court must determine whether the evidence, when considered in the light most favorable to the Commonwealth, is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty under that theory. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). Appellant argues there was no direct evidence to show that he had specific intent to murder Pruitt. In fact, to the contrary, Appellant points to testimonial evidence from himself and Plank, the only two witnesses at the scene of the shooting, which explains the shooting as simply a regrettable accident that was intended only to frighten Pruitt away from chasing their vehicle.

 We have repeatedly held that specific intent need not be proven by direct evidence. *See, e.g., Parker v. Commonwealth*, 952 S.W.2d 209, 212 (Ky.1997). It is also axiomatic that the jury is not required to believe self-serving statements from the defendant or any of his witnesses. *See Edmonds v. Commonwealth*, 906 S.W.2d 343, 347 (Ky.1995) (citing *Armstrong v. Commonwealth*, 517 S.W.2d 233, 235 (Ky.1975)). In *Parker*, we stated:

Proof of intent in a homicide case may be inferred from the character and extent of the victim's injuries. Intent may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct and a person's state of mind may be inferred from actions preceding and following the charged offense.

952 S.W.2d at 212.

In this case, there is evidence to show (1) that Appellant intentionally brought a loaded gun with him when he returned to the scene of the crime to retrieve his toolbox, (2) that Appellant intended to shoot that gun when he pointed it out the window of Plank's vehicle, and (3) that Appellant did indeed shoot Pruitt in the neck and jaw. The evidence also tends to show that Appellant did not stop to investigate or provide assistance when he observed Pruitt or his flashlight fall to the ground after the shooting, and that Appellant did not contact police or emergency services when he returned to his residence after the shooting. When viewed in the light most favorable to the Commonwealth, we find the evidence is more than sufficient to support an inference that Appellant intentionally murdered Pruitt and accordingly, the trial court did not err with respect to this instruction.

■ Appellant next argues the trial court erred when it failed to include an instruction on the lesser included offense of third degree burglary for breaking into Ziegler's and Murphy's garages. In *Houston v. Commonwealth,* 975 S.W.2d 925, 929 (Ky.1998), we explained, "Although a trial judge has a duty to prepare and give instructions on the whole law of the case, including any lesser included offenses which are supported by the evidence, that duty does not require an instruction on a theory with no evidentiary foundation." *Id.* (citations omitted). After careful review, we find an instruction on third degree burglary has no evidentiary support in this case.

Under Kentucky law, the only distinction between second and third degree burglary is the fact that second degree burglary involves the burglary of a "dwelling" and third degree burglary involves the burglary of a "building." KRS 511.030 and KRS 511.040. Appellant contends an instruction on third degree burglary was warranted in this case because the attached garages could have been considered "buildings" that were separate and apart from the attached "dwellings." We disagree.

"Dwelling" and "building" are defined in KRS 511.010 as follows:

(1) "Building," in addition to its ordinary meaning, means any structure, vehicle, watercraft or aircraft:

(a) Where any person lives; or

(b) Where people assemble for purposes of business, government, education, religion, entertainment or public transportation.

***Each unit of a building consisting of two (2) or more units separately secured or occupied is a separate building.***

(2) "Dwelling" means a building which is usually occupied by a person lodging therein.

(Emphasis added). It is implicit from this statute that individual units of a building cannot be considered "separate buildings" unless those units are separately secured or occupied.

There is no evidence to show, and Appellant does not contend, that Murphy's and Ziegler's attached garages were separately secured or occupied. Furthermore, a fair reading of the statute leads us to conclude that the drafters of this section of the penal code did not envision attached garages as "units" separate and apart from the residence building. *Cf. Stewart v. Commonwealth,* 793 S.W.2d 859 (Ky.App. 1990) (separately secured basement is part of the "dwelling" house located directly above and not a separate "building"). *See also, State v. Otto,* 529 N.W.2d 193, 195–96 (S.D.1995) (noting that "most states which have addressed the issue have concluded that an attached garage falls within the definition of occupied structure or dwelling for purposes of burglary statutes . . . ."). Accordingly, we hold the trial court did not err by failing to tender a jury instruction on the lesser included offense of third degree burglary because the attached garages in this case were part and parcel with the residences occupied by Murphy and Ziegler. *See Johnson v. Commonwealth,* 875 S.W.2d 105, 107 (Ky.App.1994) (screened-in porch that was attached to the house is part of the "dwelling" house and not a separate "building").

■ Appellant also argues the trial court erred when it failed to instruct the jury on the lesser included offense of first degree manslaughter with intent to cause serious physical injury. Although an instruction on the above theory was included among Appellant's fifteen page list of proposed jury instructions which was ten-

dered to the trial court, there is no evidence to show that Appellant's counsel took any measures to call the trial court's attention to this potential oversight at trial or to specifically object to the instruction's exclusion despite numerous opportunities to do so. In fact, after a lengthy conference with the parties regarding jury instructions, the record indicates the parties were instructed by the trial court to review the jury instructions among themselves and attempt to reach an agreement as to the final wording of the instructions. If there were any further issues that could not be resolved between the parties, they were instructed to alert the trial court. The record reflects the final instructions were presented to Appellant's counsel and to the trial court the next day and that there were no objections to the final instructions at that time or during any time when they were being read to the jury.

For adequate preservation of exceptions to jury instructions, the Kentucky Rules of Criminal Procedure require evidence on the record of either (1) a specific objection or (2) the tendering of an instruction in such a manner which presents the party's position "fairly and adequately" to the trial judge. RCr 9.54(2). In *Grooms v. Commonwealth*, 756 S.W.2d 131 (Ky.1988), we stated:

> In many cases, as in this one, counsel submit a raft of tendered instructions, any one of which may be overlooked by the trial court. The failure to instruct upon a matter which would have been surely instructed upon if the oversight had been called to the attention of the court by counsel is not error.

*Id.* at 40. In this case, we find that Appellant did not meet his duty to "fairly and accurately" present his position on this issue to the trial court and thereby preserve this issue for review. *See Davis v.*

*Commonwealth,* 967 S.W.2d 574, 581 (Ky. 1998).

Appellant's counsel also objected to the wording of certain jury instructions both during and after the Commonwealth's closing argument. Among his arguments, Appellant raises an interesting issue regarding a disparity between *Commonwealth v. Hager,* 41 S.W.3d 828, 846 (Ky. 2001), 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 11.07 (4th ed. Anderson 1993), and KRS 503.050. Appellant argues the instruction on self-protection in this case should have stated that such a defense is available if Appellant "believed Byron Pruitt was there about to use physical force upon him," such wording being in conformity with Cooper, *supra,* and *Hager, supra.* The jury instructions chosen by the trial court specified that a self-protection defense was available if Appellant believed Pruitt "was about to use *unlawful* physical force upon him," such wording being in conformity with KRS 503.050. (Emphasis added).

Yet, Appellant failed to timely preserve his arguments for review as required by RCr 9.54. *Commonwealth v. Collins,* 821 S.W.2d 488 (Ky.1991) (RCr 9.54(2) requires arguments or objections to be made *prior to the time the Court instructs the jury* in order to preserve the issue for review on appeal). Since preservation is lacking, we decline to address his arguments any further since none of them warrant review pursuant to RCr 10.26.

## V. Sufficiency of the Evidence

Appellant claims the trial court erred when it overruled his motions for directed verdicts on the first degree burglary of Ziegler's garage and on the use of first degree burglary as an aggravating sentencing factor in the murder of Pruitt. When considering whether the trial court erred in the denial of a directed verdict,

this Court must consider all evidence favoring the Commonwealth as true and from that evidence, determine whether it is sufficient to induce a reasonable jury to believe beyond a reasonable doubt that the defendant is guilty of each and every element of the crime. *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991).

■ During the penalty phase of Appellant's trial, the trial court submitted one aggravating circumstance for the jury's consideration—whether Appellant was engaged in the commission of a first degree burglary at the moment he shot Pruitt. Appellant argues there was insufficient evidence to support the submission of this aggravating circumstance to the jury and accordingly, Appellant's murder sentence must be vacated. For the reasons set forth herein, we agree.

KRS 532.025(3) states that a recommendation of death, or imprisonment for life without benefit of probation or parole, or imprisonment for life without benefit of probation or parole until the defendant has served a minimum of twenty-five (25) years shall not be imposed unless at least one statutory aggravating circumstance is found beyond a reasonable doubt and designated in writing. In this case, Appellant's sentence of life without benefit of probation or parole until he has served a minimum of twenty-five (25) years was based on the statutory aggravating factor that Pruitt was murdered while Appellant was engaged in the commission of a first degree burglary. KRS 532.025(2)(a)(2).

KRS 511.020 defines burglary in the first degree as follows:

(1) A person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime:

(a) Is armed with explosives or a deadly weapon; or

(b) Causes physical injury to any person who is not a participant in the crime; or

(c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.

The evidence most favorable to the Commonwealth shows that upon being confronted by Ziegler in his garage, Appellant fled from the scene and was chased into the woods by Ziegler. Ziegler reported that he lost track of Appellant and returned to his residence to telephone emergency services. Appellant returned to his accomplice's vehicle and the pair drove to Appellant's home. Shortly after returning home, Appellant asked his accomplice, Edwards, to drive him back to the area in order to recover a toolbox he had left at the scene. When Edwards refused to drive back to the scene, Appellant was able to persuade his sister, Plank, to drive him. Between sixteen and thirty minutes after first being confronted by Ziegler, Appellant and Plank returned to the area surrounding Ziegler's house. It was upon this return to the area that Pruitt was murdered. The Commonwealth argues that Appellant's return to the area of the burglaries was merely a continuation of the burglary that was in progress when Appellant was first confronted by Ziegler. We disagree.

When interpreting the provisions of the Kentucky penal code, KRS 500.030 states, "All provisions of this code shall be liberally construed according to the fair import of their terms, to promote justice, and to effect the objects of the law." In *Bailey v. Reeves,* this Court stated, "[w]e have a duty to accord to words of a statute their literal meaning unless to do so would lead

to an absurd or wholly unreasonable conclusion." 662 S.W.2d 832, 834 (Ky.1984).

The words of the first degree burglary statute, when read as a whole, clearly define the beginning point and the ending point of a first degree burglary in Kentucky. The statute indicates that a first degree burglary begins "when in effecting entry" into a building, continues "while in the building," and ends at the conclusion of "the immediate flight therefrom." KRS 511.020(1). Since a first degree burglary ceases upon the conclusion of a perpetrator's "immediate flight" from the building, the determinative question for this Court is whether Appellant was still engaged in the first degree burglary of Ziegler's garage when he returned to the area after an initial flight therefrom[1]. After careful review, we hold that he was not.

In *Baker v. Commonwealth*, 860 S.W.2d 760, 761 (Ky.1993), this Court was presented with the question of whether a burglar who was apprehended shortly after fleeing from the residence he had just burglarized was still engaged in "immediate flight therefrom" when he was apprehended by bystanders. In *Baker*, the defendant threatened use of a dangerous weapon not while at the scene of the burglary, but at the time he was apprehended by bystanders. *Id.* The *Baker* Court stated:

> It seems clear that the aggravating factors in the first degree burglary statute were enacted to punish those who harm or threaten harm to those at the scene of a burglary. The statute does not

limit itself to consideration of acts which take place within the curtilage of the dwelling being burglarized, but is written to protect occupants, neighbors, and passers-by.

*Id.* at 761–62. The Court ultimately concluded that the defendant was engaged in "immediate flight" at the time he was apprehended by bystanders. *Id.*

In this case, a bystander was murdered at or near the scene of the burglary, which comports with the general types of circumstances and victims the statute was intending to protect. *See Baker, supra.* Recently, in *Cosby v. Commonwealth*, 147 S.W.3d 56, 59–60 (Ky.2004), this Court determined that a defendant who committed a crime while awaiting sentencing on a criminal charge to which he had previously pled guilty could not be sentenced to a concurrent sentence for the two crimes pursuant to KRS 533.060(3). KRS 533.060(3) prohibits concurrent sentencing for two crimes when one of the two crimes was committed while the defendant was "awaiting trial" for the other crime. *Cosby* held that in order to avoid an absurd result and to uphold the integrity and fair import of the statute, it was reasonable and necessary to construe the term "awaiting trial" to include a defendant who was technically "awaiting sentencing."

Yet, this case is quite distinguishable from the facts in *Baker, supra,* and the policy reasons set forth in both *Baker* and *Cosby, supra.* In *Baker,* the defendant was in the process of fleeing from the

---

1. The Commonwealth argues in the alternative that even if Appellant's return to the area of the burglaries was not a continuation of the first degree burglary of Zeigler's garage, there is sufficient evidence to support the aggravating factor in this case based on a theory that Appellant's return to the area constituted attempt to commit a second first degree burglary. There does not appear to be sufficient evidence to support this theory in the record

and even if there was sufficient evidence to support this theory, this Court does not allow parties to change their theories on appeal or to vary the theme they offered at trial. *See Smith v. Commonwealth*, 41 S.W.3d 458, 461 (Ky.App.2001) (citing *Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky.1976)). Accordingly, we decline to address this argument.

scene of the crime, *not returning*, when he was confronted by bystanders. According to the American Heritage Dictionary of the English Language (4th ed.2000), the word "flight" is defined as "the act or an instance of running away, an escape." The word "immediate" is defined as "occurring at once; instant" and "of or near the present time." *Id.*

Because it is an "act" or an "instance," flight cannot continue *ad infinitum,* but must come to a point of some conclusion. In *People v. Thongvilay,* 62 Cal.App.4th 71, 72 Cal.Rptr.2d 738 (1998), the California Appellate Court stated:

> A burglary is in progress after the original entry while the perpetrator is fleeing in an attempt to escape. Likewise, it is still in progress so long as immediate pursuers are attempting to capture the perpetrator or to regain stolen property. *A burglary is complete when the perpetrator has eluded any pursuers and reached a place of temporary safety.*

*Id.* at 78, 72 Cal.Rptr.2d at 742 (quoting with approval the jury instructions given by the trial court) (emphasis added).

When considering what the fair import of the term "immediate flight" might be, it is logical and practical to assume that an "immediate flight" is ceased for the purposes of determining the completion of a first degree burglary at the point when the perpetrator has reached a place of temporary safety after having eluded any pursuers and escaped from the scene (which includes the immediately surrounding area). The concept of a perpetrator *returning* to the scene of the crime once that perpetrator has successfully completed an initial flight from that scene is too incongruous with the concept of "immediate flight" to be fairly read into the statute.

Furthermore, reading the circumstances of this case into the statute would create an indefinite and arbitrary law. For instance, if returning to the scene of a burglary to retrieve incriminating evidence after one has successfully fled from that scene is compatible with the concept of "immediate flight," it follows that this Court would next have to arbitrarily set some kind of temporal limitation on the perpetrator's return, such as an hour or a day, in order to avoid reading the term "immediate" completely out of the statute. Moreover, a contrary result in this case would make it nearly impossible to determine when such a return to the scene is the continuation of a past crime or the beginning of a new crime.

Finally, we note that reading the circumstances of this case into the term "immediate flight" would serve no necessary procedural or policy purpose since such circumstances are sufficiently provided for in other areas of the Kentucky penal code. For example, if Appellant's return to the area of the crime was for the purpose of re-entering Ziegler's garage or some other building with the intent to commit a crime, Appellant could have been charged with criminal attempt to commit first degree burglary. *See* KRS 506.010; *Commonwealth v. Prather,* 690 S.W.2d 396 (Ky. 1985) (upholding attempted robbery conviction where defendant was arrested while driving to the place to be robbed). As it was, Appellant was not charged with any such additional crimes because his tool box was not located inside any building or dwelling, but was found on a garbage can near Ziegler's garage door.

In sum, we find that a first degree burglary pursuant to KRS 511.020 ceases upon the conclusion of a perpetrator's "immediate flight" from the building. Appellant's flight necessarily ended in this case when he reached his home after successfully escaping from Ziegler's garage and the immediately surrounding area. Ac-

cordingly, there was insufficient evidence to support the jury's determination that the murder of Pruitt was committed while Appellant was engaged in the commission of a burglary in the first degree. Appellant's sentence for murder is vacated and remanded to the trial court for a new penalty phase trial on noncapital murder.

 Since the first degree burglary of Ziegler's garage ceased at the point Appellant reached his home after his initial flight from the scene of the burglary, we next address Appellant's argument that there was insufficient evidence to support his conviction of first degree burglary of Ziegler's garage. He contends it was unreasonable for the jury to conclude that Appellant was armed with a deadly weapon during that burglary.

Ziegler testified at trial that when he saw Appellant inside his garage, he perceived Appellant to have a weapon in his hand. In addition, it is undisputed that Appellant had a handgun when he returned to the area shortly after the completion of the first degree burglary. Appellant alleges this evidence is insufficient because Ziegler could not affirmatively state that the item in Appellant's hand was a handgun. We disagree. "It is a well-settled rule in this Commonwealth that a conviction may be obtained on circumstantial evidence." *Baker v. Commonwealth,* 860 S.W.2d 760, 761 (Ky.1993) (citation omitted). Despite Ziegler's inability to affirmatively state that the item he saw in Appellant's hand was a handgun, we find that when considered in its entirety, the evidence is sufficient to convince a reasonable juror that Appellant was armed with a deadly weapon during the burglary of Ziegler's garage. *See id.* (evidence that perpetrator was armed immediately before and immediately after perpetrator's presence in the home of victim was sufficient to

establish that perpetrator was armed while in the home).

Finally, since Appellant cannot be subjected to a capital sentence on retrial, we need not address Appellant's final argument which contends the trial court erred when it declined to give an instruction on self-defense as a mitigating circumstance during the capital sentencing phase of his trial.

The judgment of the Jefferson Circuit Court is affirmed in part; and vacated and remanded in part for resentencing on noncapital murder.

COOPER, GRAVES, JOHNSTONE, and ROACH, J.J., concur.

COOPER, J., concurs in a separate opinion in which JOHNSTONE, J., joins.

SCOTT, J., dissents in a separate opinion in which LAMBERT, C.J., and WINTERSHEIMER, J., join.

Concurring opinion by Justice COOPER.

I concur fully in Justice Graves's well-reasoned majority opinion. I write separately only to address Appellant's unpreserved claim that the self-protection instruction erroneously *included* the statutory language that he was privileged to use physical force against Byron Pruitt "if . . . he believed that Byron Pruitt was there about to use *unlawful* physical force against him." Appellant complains that this instruction, while conforming to the language of KRS 503.050(1), does not conform to the language of the *specimen* self-protection instruction *recommended* in 1 William S. Cooper, *Kentucky Instructions to Juries (Criminal)* § 11.07 (4th ed.1993), and *Commonwealth v. Hager,* 41 S.W.3d 828, 846 (Ky.2001). KRS 503.050(1) provides:

The use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself against the use or imminent use of *unlawful physical force* by the other person.

(Emphasis added.) Generally, an instruction that follows the language of the statute is not deemed erroneous. *McGuire v. Commonwealth,* 885 S.W.2d 931, 936 (Ky.1994) ("instructions should be stated within the context of the statutory framework"). Nevertheless, in their 1975 treatise on criminal instructions, Justice Palmore and Professor Lawson explained the reason for omitting the word "unlawful" from the specimen instruction as follows:

The requirement of unlawfulness is omitted because in the usual case there will be no issue as to whether the victim of the defendant's assault was acting pursuant to some legal privilege to inflict force upon his person. The typical exception would occur in an arrest situation.

John S. Palmore & Robert G. Lawson, 1 *Kentucky Instructions to Juries (Criminal)* § 10.01 cmt., at 341 (3rd ed.1975).

Palmore & Lawson cited *Owens v. Commonwealth,* 430 S.W.2d 325, 326–27 (Ky. 1968), as illustrative of "the pitfalls of using the word 'unlawful' in instructions." *Id.* In *Owens,* the defendant shot Marcum while allegedly defending himself against an unprovoked assault by McGlammer. The defendant did not claim that he intended to shoot McGlammer but mistakenly shot Marcum. *See* KRS 503.120(2). Instead, he claimed that the gun accidentally discharged during his scuffle with McGlammer. The trial court instructed the jury that it should find the defendant not guilty if it believed that the killing "was *not* the unintentional and careless discharge of a pistol by him in doing *an unlawful act[, such as scuffling with Car-*

*roll McGlammer] ...." Id.* at 326–27 (emphasis partially added). Our predecessor court reversed the defendant's conviction of voluntary manslaughter and remanded for a new trial, holding that if Appellant was acting in self-defense when scuffling with McGlammer, such scuffling "was not an unlawful act, although the court peremptorily instructed the jury that it was." *Id.* at 327.

As Palmore & Lawson suggested, situations when a defendant would believe the victim was about to *lawfully* use physical force against him are rare. Instances of lawful use of physical force are defined in KRS Chapter 503, "General Principles of Justification," and include force used by the victim in self-protection when the defendant was the initial aggressor, KRS 503.060(3); force provoked by the defendant, KRS 503.060(2); force used by a police officer or a person acting under official authority in effecting a lawful arrest, KRS 503.060(1), KRS 503.090; force used to prevent suicide or to prevent the commission of a crime involving or threatening serious physical injury to person, substantial damage to or loss of property, or any other violent conduct, KRS 503.100; or force used by a parent, guardian, teacher, official at a correctional institution, operator of a common carrier vehicle, doctor, or other therapist under circumstances specified in KRS 503.110. When there is evidence of such an exception to the privilege to act in self-protection, it is usually identified as such in a separate instruction or by a proviso to the self-protection instruction, itself. *See, e.g.,* Cooper, *supra,* §§ 11.11—11.13, 11.18B, & 11.20—11.27. For example, under the facts of this case, if the trial court believed there was sufficient evidence for the jury to find that Appellant believed Pruitt was about to use physical force against him for a *lawful*

purpose, the following specimen instruction would have been appropriate:

### INSTRUCTION NO. ____ SELF–PROTECTION

Even though the Defendant might otherwise be guilty of Murder under Instruction No. ____, if at the time the Defendant killed Byron Pruitt (if he did so), he believed that Pruitt was then and there about to use physical force upon him, he was privileged to use such physical force against Pruitt as he believed to be necessary in order to protect himself against it, but including the right to use deadly physical force in so doing only if he believed it to be necessary to protect himself from death or serious physical injury at the hands of Pruitt.

Provided, however, if you further believe beyond a reasonable doubt that the Defendant believed Pruitt intended to use physical force against him for the purpose of preventing him from committing a crime involving or threatening substantial damage to or loss of property, then the Defendant was not so privileged and is not entitled to the defense of self-protection.

KRS 503.100(1)(b); *cf.* Cooper, *supra*, § 11.13.

Use of this or a similar specimen would have eliminated any speculation by the jury as to what conduct by Pruitt would have been lawful and whether Appellant believed that Pruitt's threatened use of physical force against him was for a lawful purpose. *E.g.*, under the trial court's instruction, the jury may have concluded that Appellant believed that Pruitt intended to arrest him for his previous crimes and that such was a lawful purpose for the use of physical force—which, of course, would have been incorrect since Pruitt was neither a police officer nor acting under official authority. If, as is usually the

case, there is no evidence that would support a finding by the jury that the defendant believed that the victim's threatened use of physical force was lawful, use of the specimen instruction recommended in Palmore & Lawson, *supra*, § 10.01, in Cooper, *supra*, § 11.07, and in *Hager* will avoid any such speculation.

However, if there is evidence from which the jury could find that the defendant believed the victim's threatened use of physical force was lawful, the nature of the lawful conduct should be identified. Assuming there was sufficient evidence from which the jury could have found that Appellant believed Pruitt intended to use physical force against him for the purpose of preventing him from committing a crime involving substantial damage to or loss of property, the instruction given by the trial court was not erroneous, just insufficiently specific, thus permitting unwarranted speculation by the jury. Appellant did not object to the instruction on that ground and did not tender a clarifying instruction, such as the specimen described, *supra.* RCr 9.54(2).

JOHNSTONE, J., joins this concurring opinion.

Opinion by Justice SCOTT, concurring in part and dissenting in part.

Although I concur with the majority on all other issues, I respectfully dissent from the issue of whether Byron Pruitt was murdered during the commission of a First–Degree Burglary.

The majority relies on *Baker v. Commonwealth*, 860 S.W.2d 760 (Ky.1993), in support of its holding on the definition of "immediate flight," but distinguishes the facts of the *Baker* case from the facts of this case to overturn the jury's verdict.

"It seems clear that the aggravating factors in the first-degree-burglary statute

were enacted to punish those who harm or threaten harm to those at the scene of a burglary. The statute does not limit itself to consideration of acts which take place within the curtilage of the dwelling being burglarized, but is written to protect occupants, neighbors, and passers-by." *Baker* at 761–762. I don't read any language in *Baker* to suggest that "immediate flight" has to be the cookie cutter burglary suggested by the majority, i.e., "in and out" of a building, without deviation.

Not only does *Baker* recognize the statute's intention to protect people like Byron Pruitt, it also recognizes that the question of whether a death occurs during an immediate flight is one for the trier of fact. Furthermore, *Baker* relies on several like cases from outside this jurisdiction, including *People v. Ruiz,* 136 A.D.2d 493, 523 N.Y.S.2d 814 (1988), for the presumption that a burglar can arm himself at anytime during the immediate flight from the dwelling and that a defendant may be properly convicted of First–Degree Burglary in that instance. *Id.* at 762. Interestingly, the *Ruiz* case goes on to hold, in no uncertain terms, that "[t]he question of whether an act takes place in 'immediate flight' from a felony is generally left to the sound discretion of the jury pursuant to an appropriate charge." *Id.* at 495, 523 N.Y.S.2d 814; citing *People v. Gladman,* 41 N.Y.2d 123, 390 N.Y.S.2d 912, 359 N.E.2d 420 (N.Y.1976) (felon held to have been in "immediate flight" some 15 minutes after and one-half mile away from the scene of a robbery); *see also People v. Sturgis,* 112 A.D.2d 757, 492 N.Y.S.2d 257 (1985) (suspect apprehended in New Jersey after burglary in New York; questions regarding causation and whether the deaths occurred in the course of "immediate flight" from the commission of the burglary were questions of fact for the jury).

The Appellant argues that there was insufficient evidence to overcome a directed verdict on the First–Degree Burglary charge and therefore its use as an aggravating sentencing factor in the murder of Pruitt was error. In evaluating the evidence presented at trial, in conjunction with the standard for a directed verdict in *Benham,* 816 S.W.2d 186, 187 (Ky.1991) (under the evidence as a whole and assuming the evidence for the Commonwealth is true, it would be clearly unreasonable for a jury to find guilt, then directed verdict warranted), the trial court acted properly in overruling the Appellant's motion for directed verdict and the jury was entitled to decide the issue.

The jury knew of the burglary at Zeigler's house, believed it was the Appellant **and knew Pruitt was killed soon thereafter, close to the scene of the burglary.** Thus in any event, facts were available from which the jury could reasonably believe Pruitt was killed by the Appellant while in "immediate flight"—even under the standard adopted by the majority opinion. What the majority opinion does however, is require the jury to believe the Appellant's witnesses "that immediate flight" had ceased. However, this itself is error since the jury is not required to believe the testimony of any particular witness, *see Davis v. Commonwealth,* 270 Ky. 53, 109 S.W.2d 2, 3 (1937); a point which the majority now mandates. During their deliberation, the jury sought guidance from the trial court on the issue of "immediate flight" and was properly instructed by the trial court to evaluate the evidence presented and according to the tendered instructions, make a determination as to whether Byron Pruitt was killed during the commission of a First–Degree Burglary. The jury did just that and, absent some error not asserted in this appeal, we should not disturb the jury's verdict.

Further, I do not find anything in a plain reading of KRS 511.020 to suggest a burglary is complete, or finished, if a perpetrator, intends to and does, return to the scene of the burglary to finish the job, fifteen to twenty minutes later; so as to retrieve his burglary tools—in order to complete the escape.

Just as the Appellant's return to 9000 Grand Point Court to retrieve the generator he stole was the completion of his initial burglary, his return to 7613 Parkridge Trace to get his tool box would have been the completion of his second burglary, and the attempted return to complete this second burglary resulted in the death of an innocent man.

Not having completed the burglary, and intent on hanging around to re-acquire his burglary tools from the scene, he was still in "immediate flight." The fact that he had to get another driver did not end the "immediate flight." Under facts such as these, "immediate flight" should never be held to end until the perpetrator completes or gives up on the burglary and finally attempts to flee the scene to apparent safety. **That did not happen here, as the death of Mr. Pruitt proves.**

I would hold that the Appellant was still in the course of his "immediate flight" from the Zeigler's home when he killed Pruitt. The Appellant failed to present any rational argument sufficient to warrant disturbing the jury's verdict on the facts of this case. Thus, I would affirm the Appellant's convictions and sentences on all counts.

LAMBERT, C.J., and WINTERSHEIMER, J., joins this opinion.