# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: MARCH 26, 2020
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

DATE 5/18/20

2019-SC-000106-MR
AND
2019-SC-000150-TG

WILLARD FLYNN                                                                APPELLANT

ON APPEAL FROM OWEN CIRCUIT COURT
V.          HONORABLE REBECCA LESLIE KNIGHT, JUDGE
NO. 18-CR-00015

COMMONWEALTH OF KENTUCKY                                      APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

Willard Dempsey Flynn was convicted of first-degree assault, unlawful imprisonment, unlawful transaction with a minor, possession of a controlled substance and possession of drug paraphernalia. Pursuant to the jury's recommendation, the Owen Circuit Court sentenced him to thirty-eight years. Flynn now appeals as a matter of right,[1] raising two claims of error: 1) prosecutorial misconduct with respect to his cross-examination and 2) improper admission of evidence. After review of the record and applicable law, we affirm Flynn's conviction.

---

[1] Ky. Const. § 110(2)(b).

1

## I. Background.

The charges against Flynn arose from his co-habitation with, and abuse of, his girlfriend at the time, Tabatha Propes; their illicit drug use (including methamphetamine), and the illicit drug use by a minor who was also residing in the home. Until February 2018, Propes was living with her grandmother, Patsy Coleman, after which time she left to go live with Flynn at his friend Jay Risch's house. Multiple people were staying at the Risch residence, where illicit drug use, including methamphetamine, was prevalent. Flynn and Propes stayed in a room together. According to Propes's testimony at trial, Flynn would become physically violent towards her after using methamphetamine and inflicted multiple head wounds, among other injuries; refused to let her leave the bedroom without him; and forbade her from leaving the residence. She said Flynn threatened to kill her if she asked for help from anyone else in the house or tried to leave.

Prior to staying at Risch's house, Propes had filed her tax return and in March 2018 was expecting a refund check to arrive at her grandmother Coleman's house. Under Flynn's supervision, Propes phoned Coleman to see if the refund check had arrived and on March 15, learned that it had. Propes informed Coleman that Risch would pick up the check, which he did. On March 16, Propes convinced Flynn to let her leave the house to cash the refund check. Propes covered her head with a hat and left the house with another woman named Candace who was also residing there. Propes and Candace went to the Walmart in Dry Ridge, at which time Propes called Coleman and asked her to meet her at the Speedway in Dry Ridge. Her grandmother met her

2

and gave her a ride to the Dry Ridge Motor Inn and left her there. Once at the hotel, Propes took pictures of her head wound, sent them to her friend Carla and asked Carla to pick her up and take her to the hospital.

At the hospital, Propes presented with a very swollen head containing large areas of necrotic skin caused by a forceful injury. The hospital called the police and Trooper Kyle Trosper responded. After learning details from Propes, Trooper Trosper, along with other officers, went to Risch's house where they found Flynn on the floor of the living room, hiding under some blankets. A pipe containing a burnt crystalline substance was found within arm's reach of Flynn, and Flynn admitted it was his meth pipe. Trooper Trosper arrested Flynn and, while at the residence, encountered a juvenile who was under the influence of methamphetamine.

Meanwhile, at the hospital, Propes's head was drained and she had surgery to excise the dead tissue. She left the hospital twelve days later with open wounds on her scalp and in possession of a wound vacuum, which a home nursing service had to help change. Her treating physician testified that Propes could have skin grafts then surgery to stretch the remaining scalp tissue with hair; however, those areas will never regrow hair.

Flynn was indicted for first-degree assault, unlawful imprisonment, unlawful transaction with a minor, possession of a controlled substance and possession of drug paraphernalia. A jury convicted him on all counts, recommending a total sentence of thirty-eight years, which the trial court imposed. Flynn now appeals as a matter of right.

3

## II. Analysis.

### a. *Flynn's Cross-Examination.*

Flynn asserts that the Commonwealth's cross-examination of him was improper because it assumed facts not in evidence and mischaracterized Coleman's testimony. This claimed error is unpreserved, thus we review it for palpable error only under RCr[2] 10.26 which provides:

> A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

"Palpable error relief is available under RCr 10.26 only upon a determination that manifest injustice has resulted from the error. 'Manifest injustice' is 'error [that] so seriously affect[s] the fairness, integrity, or public reputation of the proceeding as to be shocking or jurisprudentially intolerable." *Davidson v. Commonwealth,* 548 S.W.3d 255, 261 (Ky. 2018) (quoting *Miller v. Commonwealth,* 283 S.W.3d 690, 695 (Ky. 2009)).

Specifically, Flynn challenges an exchange that occurred between him and the Commonwealth on cross-examination in which the Commonwealth's questions indicated that Coleman had previously testified that Flynn and Propes had moved out of her house because of Flynn's prior abuse of Propes. Flynn asserts that Coleman never testified about prior abuse as the reason for their departure, and that the Commonwealth's line of questioning, including

---

[2] Kentucky Rules of Criminal Procedure.

4

asking him to characterize Coleman's testimony as "mistaken," amounted to "flagrant" prosecutorial misconduct rendering his trial fundamentally unfair.

On cross-examination, the Commonwealth asked Flynn if he had struck Propes in the head with a wrench and he denied it. After that exchange, the Commonwealth continued to question him as follows:

> **CW:** You hit her, didn't you?
> **Flynn:** No, I swear I did not hit Tabatha.
> **CW:** You left her grandmother's house for that exact same thing, didn't you?
> **Flynn:** No, that's not true.
> **CW:** You were present in the courtroom when her grandmother testified yesterday, weren't you sir?
> **Flynn:** Yes ma'am, I was.
> **CW:** And you heard her testimony with regard to why you weren't there anymore, didn't you sir?
> **Flynn:** I didn't hear her say that.
> **CW:** So, is grandmother mistaken?
> **Flynn:** I don't know, I never heard her say that yesterday.

The Commonwealth concedes that Coleman did not testify that Flynn's abuse of Propes was the reason they stopped living at her house; Coleman simply stated that they moved out of her house in February 2018. However, prior to Coleman's testimony, Propes testified that her grandmother did not want them staying at her house because Flynn had hit Propes previously. Thus, the Commonwealth maintains that evidence of a prior assault as the reason Propes and Flynn left Coleman's house was in evidence, but was introduced through Propes rather than Coleman. Accordingly, the Commonwealth asserts that while its line of questioning could have misled the jury as to who testified about the prior assault, it did not assert entirely new evidence.

5

"Prosecutorial misconduct is a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment." *Murphy v. Commonwealth*, 509 S.W.3d 34, 49 (Ky. 2017) (internal quotations omitted). "If the defendant failed to object, however, the Court will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair." *Id.* (internal quotations omitted).

We employ a four-part test to determine whether a prosecutor's conduct was "flagrant":

> (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused.

*Bowling v. Commonwealth*, 553 S.W.3d 231, 243 (Ky. 2018).

With respect to the first prong of the test, the long-standing rule is that "[a] witness should not be required to characterize the testimony of another witness . . . as lying." *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010) (citation omitted). Notably here, the Commonwealth did not ask Flynn whether Coleman had lied, it asked whether she was mistaken. While courts have distinguished between "mistake" and "lie" for these purposes, we need not do so now since under the palpable error standard of review, it did not amount to "flagrant" misconduct for the Commonwealth to ask Flynn if another witness's version of events differed from his own, especially since Propes's allegations of prior abuse were already in the record. *See id.* at 88 ("Since Duncan's defense was precisely that the three victims had mistakenly identified him, it assuredly

6

did not amount to flagrant misconduct for the prosecutor to ask him if they had to be mistaken for his version of events to be true[.]"); *see also United States v. Gaines*, 170 F.3d 72, 82 (1st Cir. 1999) (with respect to the distinction between "mistake" and "lie," "[w]hether this avoidance [of the "L" word] would suffice in all situations, we need not decide now. As [the defendant] did not object in the district court to these questions . . . our review is limited to plain error. Clearly that standard was not transgressed[]").

Further, while the Commonwealth mischaracterized Coleman's testimony, it does not appear from the record that it intended to mislead the jury. Rather, as discussed below, the prosecutor more likely accidentally confused Coleman's testimony with Propes's. Regarding any prejudice to Flynn, he maintains that Propes's allegations of prior abuse were bolstered by the Commonwealth's insinuation that a third party (Coleman) had witnessed the abuse, especially since no one else testified to witnessing the abuse. However, any prejudice to Flynn was likely minimal, as the jury had heard Coleman's testimony and knew that she had not identified Flynn's prior abuse of Propes as the reason they moved out of her house. That the Commonwealth's line of questioning created some confusion on this issue does not render the trial fundamentally unfair, especially considering the other three factors of the "flagrancy" test.

Regarding the second and third factors, the Commonwealth's questions were isolated, not extensive, and again, likely accidentally placed before the jury. The entire exchange between the prosecutor and Flynn lasted approximately twenty-five seconds and was not mentioned again. The isolated

7

nature of this exchange is distinguishable from *Duncan*, upon which Flynn relies, in which the prosecutor's improper cross-examination concerning DNA evidence *and* misrepresentation of an expert witness's testimony regarding DNA evidence during closing arguments (to which the defendant objected) amounted to flagrant misconduct, "given the aura of conclusiveness that surrounds DNA evidence," and the prosecutor's invitation to the jury "to be its own expert—to make inferences that it was not qualified to make and which amounted to pure speculation." *Duncan*, 322 S.W.3d at 92. Here, the evidence at issue neither involved DNA evidence nor was referred to repeatedly by the Commonwealth. The brevity of the exchange between the Commonwealth and Flynn, and the fact that the prosecutor did not expound upon it during closing arguments, suggests that the prosecutor inadvertently confused Propes's testimony with Coleman's regarding the prior abuse and realized it shortly thereafter.

Lastly, the evidence against Flynn was extensive. Propes testified to the abuse that occurred at Risch's house, including the multiple blows to her head; Coleman testified that when she went to Dry Ridge to pick up Propes on March 16, Propes was driving Flynn's vehicle with another female as passenger, Propes's eyes were bloodshot and swollen, and Coleman knew something was wrong; Trooper Trosper testified that the bedroom at Risch's was as Propes described and that, in his professional opinion, Flynn was high on meth when arrested; Jason Johnson, who resided at Risch's house when Flynn and Propes were there, testified that the entire time he stayed there he never saw Propes outside of the bedroom without Flynn, he had observed Propes with a black eye

8

but did not inquire into it as he had been informed by someone staying at Risch's house not to get involved, that Propes usually wore a sock hat/toboggan indoors, that he had heard arguing from Propes's and Flynn's bedroom, that on March 16 Propes left in Flynn's car with Candace to go to Walmart and never returned, and that once Flynn realized Propes was not in the car when Candace returned he threatened everyone, warning them that if they did not help find Propes they would get hurt; and Propes's treating physician diagnosed Propes's injury as a forcible injury to the head.

While no one other than Propes testified to witnessing Flynn assault her, "[i]t is a well-settled rule in this Commonwealth that a conviction may be obtained on circumstantial evidence." *Pollini v. Commonwealth*, 172 S.W.3d 418, 432 (Ky. 2005) (citation omitted). Under the four-part test used to analyze whether a prosecutor's behavior amounts to "flagrant misconduct," the factors weigh in favor of the Commonwealth. The prosecutor's cross-examination of Flynn did not render the trial fundamentally unfair or result in a manifest injustice amounting to palpable error. Therefore, reversal on this basis is unwarranted.

### b. *The Admission of Commonwealth's Exhibits #38-41.*

Flynn claims that the trial court abused its discretion by admitting four photographs of Propes's head injuries following surgery. Exhibits #38-39 were taken on March 19, 2018, directly after surgery, and Exhibits #40-41 were taken a week later on March 26, 2018. Each set of photographs shows a left and right-side image of Propes's injuries post-surgery. Flynn argues that all four photographs should have been excluded as they were not necessary to the

Commonwealth's case and only serve to inflame the jury due to their gruesome nature, resulting in prejudice to Flynn.

A trial court must evaluate "visual media showing gruesome or repulsive depictions of victims . . . [by] conduct[ing] the Rule 403 balancing test to determine the admissibility of the proffered evidence." *Hall v. Commonwealth*, 468 S.W.3d 814, 823 (Ky. 2015). Further, "[t]he trial judge is always required to weigh the probative value of the gruesome photo in question against the harmful effects that might flow from its admission to determine whether the photo should be excluded notwithstanding the general rule." *Id.* Here the trial court determined that the post-procedure photos' probative value outweighed its prejudicial effect because the procedure was "necessitated by the assault and resulting injuries." The trial court made this determination by analyzing our unpublished decision in *Campbell v. Commonwealth*, No. 2006-SC-000931-MR, 2009 WL 737004, at *6 (Ky. Mar. 19, 2009). While *Campbell* is unpublished, its holding is persuasive. In that case, we held that a photograph is not inadmissible for simply showing an injury post-surgery. *Id.* While the images in *Campbell* were not gruesome, whereas the images in the present case most certainly are, the facts of this case only serve to buttress *Campbell's* holding that post-surgery photographs may be admissible because the surgery was "necessitated by the assault" and the post-surgery photographs showed the "resulting injuries." *Id.* Significantly, Propes's pre-surgery photographs do not show the extent of the injuries caused by the alleged assault, as her hair covers many visible markings and her necrotic skin. Additionally, as Flynn's jury instructions included first-degree, second-degree and fourth-degree

10

assault instructions, the post-surgery photographs were relevant to allow the jury to determine whether the alleged assault caused a "serious physical injury" or simply a "physical injury." *See* KRS[3] 508.010; KRS 508.020; KRS 508.030; *see also Gardner v. State*, 573 So.2d 716, 719 (Miss. 1990) (holding that "the introduction of [both pre-surgery and post-surgery] photographs in this case were not only relevant and probative, but absolutely necessary to aid the jury in its decision of whether the assault with fists constituted aggravated assault or simple assault[]"). Thus, on balance, the images the photographs depicted were highly relevant and probative.

Furthermore, the admission of Exhibits #40-41 was not "needlessly cumulative[,]" as they were introduced to show the severity of the wound and the lack of healing post-surgery. *Hall*, 468 S.W.3d at 828. Therefore, the admission of Exhibits #40-41 was not an abuse of discretion.

## III. Conclusion.

After review of the applicable facts and case law, we hold the Commonwealth's cross-examination of Flynn did not amount to flagrant misconduct, rendering the trial fundamentally unfair. We further hold that Exhibits #38-41 were properly admitted. Thus, Flynn's conviction is affirmed.

All sitting. All concur.

---

[3] Kentucky Revised Statutes.

11

COUNSEL FOR APPELLANT:

Molly Mattingly
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Kristin Leigh Conder
Assistant Attorney General